667 So.2d 599 (1995)
Stanley Ray ELLIS
v.
STATE of Mississippi.
No. 91-KA-01001-SCT.
Supreme Court of Mississippi.
November 30, 1995.
*600 J. Edward Rainer, Rainer & Hyche, Brandon, MS; for appellant.
Michael C. Moore, Attorney General, Jackson, MS; W. Glenn Watts, Sp. Ass't Attorney General, Jackson, MS; John T. Kitchens, District Attorney, Brandon, MS; for appellee.

*601 ON PETITION FOR REHEARING

PRATHER, Presiding Justice, for the Court:
This Court grants the petition for rehearing and the original opinions are withdrawn and these opinions substituted therefor.

I. INTRODUCTION AND PROCEDURAL HISTORY
Stanley R. Ellis was indicted for rape, in violation of Miss. Code Ann. § 97-3-65, in November 1990 in the Circuit Court of Rankin County. Following a trial on the merits, a jury found Ellis guilty, but was unable to fix a penalty. The court subsequently sentenced Ellis to twenty-five (25) years in Mississippi Department of Corrections and ordered payment of court costs, fees, and assessments. Ellis' motion for Judgment Notwithstanding the Verdict (JNOV) or, in the alternative, for a new trial was overruled. Ellis thereafter perfected his appeal to this Court, seeking review of the following issues:
A. Whether the trial court erred by failing to suppress the in-court identification of Ellis by the victim because the roadside identification was so impermissibly suggestive that it gave rise to a very substantial likelihood of irreparable misidentification;
B. Whether the stop, search, and seizure of Ellis and his vehicle were illegal;
C. Whether the trial court erred in sustaining the State's motion in limine to exclude the testimony of Dr. Charlton Stanley;
D. Whether the trial court erred in allowing Officer Tony Smith's testimony;
E. Whether the trial court erred in allowing the State, on closing argument, to comment on Officer Tony Smith's testimony;
F. Whether the trial court erred by admitting State's exhibit S-5 into evidence;
G. Whether the trial court erred by admitting State's exhibit S-3 into evidence;
H. Whether the overwhelming weight of the evidence was against the verdict of the jury; and
I. Whether the trial court erred in refusing to grant a directed verdict in favor of Ellis.
After considering the issue raised, this Court affirms the conviction and sentence of Stanley Ray Ellis.

II. THE FACTS
Susan Wheeler, a twenty-year-old Mississippi State student, was traveling south on Highway 25, from Starkville to Jackson, late in the evening of October 3, 1990. She left Starkville between 10:30 and 11:30 p.m. and stopped at a gas station just north of the Highway 25  Highway 35 junction, where she called her roommate and got a coke. Shortly after she resumed her drive to Jackson, at about 12:30 a.m., Wheeler noticed a vehicle approaching her quickly from behind. Once this vehicle caught up with Wheeler's car, it matched her speed and followed her for a while. Eventually, the vehicle which was following Wheeler, a pickup truck, pulled alongside Wheeler's car, heading south in the northbound lane, and the truck driver motioned to Wheeler to stop; she did, and so did the other vehicle.[1] The driver of the truck rolled down his passenger side window and told Wheeler her car was making sparks. Wheeler opened her car door and looked at her rear tire, but saw nothing amiss. The truck driver told Wheeler to drive on to see if the problem would continue. About three miles later, the truck driver again motioned for Wheeler to pull over, which she did; the truck also pulled over and stopped behind Wheeler's car. The truck driver told Wheeler her car was still making sparks, and he examined the rear of her car with the help of a foot-long silver, heavy duty, flashlight. Again, the truck driver told Wheeler to try driving so he could see what would happen; *602 again she complied. Soon after Wheeler had resumed driving, the truck driver motioned for her to pull over, which she did. The truck pulled over and stopped directly behind Wheeler's car. The truck driver exited his truck and stood by the driver's side door. Wheeler also left her car to examine the rear of her vehicle. Both vehicles were left with engines running and headlights on.[2] Upon the truck driver's urging, Wheeler examined the right rear tire of her car, then came back to the left side to kick the left rear tire. When she looked up, the truck driver was standing at the front of his truck at the driver's side, holding a gun  either a shotgun or a rifle with two barrels  at hip level and pointing at Wheeler.
At the truck driver's direction, Wheeler walked around to the off-road side of her car, and stood facing south with the truck driver behind her. When a car began approaching from the south, the truck driver pressed the gun into her back and told Wheeler to bend down and pretend to look at her car, which she did. Wheeler did not attempt to signal the passing car because the truck driver warned her not to try anything "funny." After the car passed, the truck driver told Wheeler to stand up as he reached around her, unbuttoned her pants, and put his hand into her panties. Wheeler asked the truck driver not to kill her; he said she would be fine if she cooperated. With the gun pressed into her back, Wheeler followed the truck driver's instruction to walk into the woods. When she stopped walking, the truck driver pulled Wheeler's parts and underclothes down to her knees and told her to bend over with her hands on her knees. She cooperated, and the truck driver raped her vaginally. At trial, Wheeler was unsure whether her attacker had ejaculated; however, in a previous statement she said he had ejaculated and she claimed to have felt the fluid running down her leg.
After the rape, the attacker told Wheeler to pull her pants up and walk out of the woods, which she did, with him right behind. The attacker guided Wheeler to the front of her car and told her to bend down and stay there until he was gone. After her attacker left in his truck, driving north on Highway 25, Wheeler got in her car and wrote down the time  1:20 a.m.  and mileage as shown on her odometer. Wheeler sped toward Jackson, Mississippi and stopped at a BP station across from Castlewoods Estates, where she used a pay phone to call Mary Covert, a friend who lived in Castlewoods. Covert testified that this call was made between 1:30 and 1:45 a.m. While telling Covert what had just transpired, Wheeler saw a police car across the street. She hailed the officer, Deputy Sheriff Myers with the Rankin County Sheriff's Department, told him of her rape, and described her attacker and his truck.
Wheeler described her attacker as a skinny white male, about five feet seven inches, 150 pounds, with short brown hair cut over the ears, curly in back, a pointy face, chin, and nose, and a mustache. Wheeler testified she told the officer the man was "[a]bout this much" shorter than she, and the officer estimated the attacker's height to be about 5'10". Myers testified Wheeler had described her attacker as five feet ten inches. Myers had previously testified that Wheeler estimated her attacker's height as three or four inches shorter than herself. Myers further testified that Wheeler said her attacker wore boots. Wheeler described the truck as a big pickup truck, about 1980, brown on top and beige on the bottom, either a Ford, Chevrolet, or GMC. Wheeler also advised Myers that she last saw her attacker traveling north on Highway 25. Myers put out a "BOLO"[3]  be on the lookout  for a truck and driver fitting the descriptions given by Wheeler.
While Wheeler was talking to Myers, Mary Covert arrived at the BP station and called Wheeler's boyfriend, Scott Weatherall. Wheeler and Covert then drove to River Oaks Hospital in Flowood, where Wheeler was examined and a rape test kit was taken. When the rape test kit was complete, Wheeler *603 was informed that law enforcement authorities had apprehended her attacker.
Tony Smith, of the Leake County Sheriff's Department, received the "BOLO" at home at about 2:00 a.m. and thought it described Stanley Ellis, whom Smith had known for "as long as he could remember." Smith went directly to Stanley Ellis' home to see if his truck was there. When it was not, Smith drove south on Highway 25, looking for a large brown and beige pickup truck. At the Leake-Scott County line, Smith noticed a truck fitting the description, with its flashers on, parked on the side of the highway. After determining that no one was inside the truck, Smith reported his finding to the Rankin County Sheriff's Department via the Carthage Police Department. Smith then drove north on Highway 25 to an exit, turned around and headed south again, and met the truck he had just seen, now being driven north on Highway 25. Smith turned around and drove behind the truck, advised the Carthage Police Department of his actions, and kept following the truck while waiting to meet a Rankin County law enforcement unit as promised by the Carthage Police. While following the truck toward Carthage, Smith radioed for a Carthage Police officer to assist him in a stop on Highway 16 in Carthage. Officer Jeff Edwards of the Carthage Police Department responded. When he and Smith turned on their blue lights signaling the driver to stop, the pickup truck driver did so.
Myers, at the direction of his dispatcher, drove to Leake County, where he met Officers Smith and Edwards of the Carthage Police Department. Stanley Ellis was with the two officers on Highway 16 in Carthage. Myers thought Ellis matched the description he had received from Wheeler, except for the difference in weight and that Ellis had straight hair. Myers testified that Ellis had on boots and a short sleeved shirt at the time of his arrest, as described by Wheeler.[4] Myers told Ellis why he was there, advised him of his Miranda rights, and obtained a consent to search Ellis' vehicle, a brown and beige pickup truck. The search yielded a twenty-two automatic rifle and a small chrome or silver flashlight. The rifle obtained in the search did not have two barrels, but at trial Myers denied that Wheeler had described the gun to him as double barreled. Ellis' flashlight is smaller and lighter than the one described by Wheeler at trial; Myers claimed Wheeler's description of the flashlight to him was merely that it was silver or chrome. Ellis was taken into custody and taken to Rankin County.
At about 9:00 a.m. October 4, 1990, after Ellis was arrested, Wheeler gave a statement to Officer Ronnie Pennington of the Rankin County Sheriff's Department. Pennington subsequently advised Ellis of his rights and took, with Ellis' cooperation, blood, head, and pubic hair samples for a rape test kit and also took Ellis' clothing for testing.
At trial, Ellis' mother and father testified that their son had left their home at about 7:00 p.m. on October 3, with his brother and a friend, to do some work on Ellis' 1981 brown and beige GMC pickup truck. Randy Boatner, who helped Ellis work on his truck that night, testified that at about 10:30 or 11:00 p.m. that night he and Ellis drove Ellis' newly repaired pickup truck to the Junior Food Mart in Canton. After purchasing gasoline and cigarettes, they drove through Twin City, approximately five miles south of Carthage, then to Edinberg, about ten miles away, and back to Carthage. Ellis then dropped Boatner off at Boatner's father's house, about three to five miles from Ellis' home, at about 1:10 a.m. Boatner's stepmother corroborated the time Boatner arrived at his father's home. Warren Tate, Ellis' neighbor, measured the distance from the Boatners' home to the spot of the rape as twenty-nine miles by vehicle. It took Tate thirty-two minutes to travel that distance.
Ellis took the stand in his own defense and testified he did not rape Susan Wheeler. The remainder of his testimony regarding the events of that night were as follows. After leaving Boatner at Boatner's father's house, Ellis drove north on Highway 35 to a convenience store, then realized he did not *604 have a check with him and could not make the purchases he had planned to make. Ellis turned around and headed south on Highway 35, toward Pine Tree Grocery, to wash his truck. After washing his truck, at about 2:00 a.m., he left Pine Tree Grocery and drove south on Highway 25 to scout for deer in an area where he had previously hunted deer. When he got within a mile of this area, he stopped to take a shot at a deer he saw on the side of the road. He then turned around by driving down into the ditch and drove north to a convenience store where he purchased a coke from a vending machine. Next, Ellis returned to the spot where he had just shot at the deer and pulled over on the shoulder of the highway, turned his flashers on, and left the road to look for the deer with his flashlight. Ellis estimated that this happened at about 2:30 or 2:45 a.m. He stayed in the woods for about fifteen minutes, then noticed a deputy driving by on the highway.
This deputy turned around and drove back, stopping behind Ellis' truck briefly, then drove on toward Carthage. Ellis then came out of the woods, got into his truck, and drove toward Carthage. He soon met the deputy, who had turned around and was now driving south, toward Ellis. After passing Ellis, the deputy again turned around and followed Ellis into the city limits of Carthage, at which point he turned on his blue lights signaling Ellis to pull over.
Ellis told Officer Tony Smith that his truck had been running hot and he was parked on the side of the highway earlier to get some water for his engine from the ditch. Ellis admitted at trial that he had lied to Smith, but only because he did not want to admit to illegal deer hunting. Ellis further testified that he was five feet ten inches tall, about one hundred twenty-five pounds, with slightly wavy, but not curly, hair. He claimed ownership of both the flashlight and the rifle taken from his truck and entered into evidence; the rifle was the gun he used to shoot deer. Ellis admitted that someone who was not familiar with guns might describe his twenty-two rifle as double-barreled.
As to Wheeler's testimony, she had seen her attacker clearly the third time he stopped her, when she was behind her car. Wheeler identified Stanley Ellis at his trial and also identified his flashlight and a photograph of his pickup truck. An examination of the rape test kits and of Wheeler's and Ellis' clothing revealed: no head or pubic hair of Ellis on Wheeler's person, clothing, or undergarments; no fibers from Wheeler's clothing on Ellis' clothing nor vice versa; no traces of Wheeler's blood or saliva on the person or clothing of Ellis or vice versa; and no traces of semen in Wheeler's vaginal canal, person, or clothing or on Ellis' person or clothing. Wheeler exhibited no bruises or scratches on her person.
Although Wheeler had written down the mileage from her odometer at the scene of the rape, she was later unable to pinpoint the area for law enforcement officers. No boot or shoe prints were found in the general area where the rape occurred, even though Wheeler and her attacker had walked some fifteen or twenty feet into the woods. Although tire tracks were discovered on the side of the road in the area where the rape occurred, the State made no attempt to prove that these tracks matched the truck driven by Ellis.

III. THE LAW

A. Whether the trial court erred by failing to suppress the in-court identification of Ellis by the victim because the roadside identification was so impermissibly suggestive that it gave rise to a very substantial likelihood of irreparable misidentification.

1. The Parties' Contentions
Ellis argues his roadside pretrial identification by Wheeler was impermissibly suggestive because Wheeler was told, before she was asked to identify Ellis, that her attacker had been apprehended. No other "suspects" were presented to Wheeler at this time. Ellis claims that the State was required to clearly and convincingly show that Wheeler's in-court identification of him was based upon observations of him other than those made at the roadside pre-trial identification.
*605 The State responds that the roadside identification was not impermissibly suggestive and that there was a sufficient independent basis for Wheeler's identification of Ellis.

2. Standard of Review
The standard of review for suppression hearing findings in a matter of pre-trial identification cases is whether or not substantial credible evidence supports the trial court's findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted. Magee v. State, 542 So.2d 228, 231 (Miss. 1989); Nicholson v. State, 523 So.2d 68, 71 (Miss. 1988); Ray v. State, 503 So.2d 222, 224 (Miss. 1986). The appellate review should disturb the findings of the lower court "only where there is an absence of substantial credible evidence supporting it." [Emphasis added]. Ray v. State, 503 So.2d at 224.
The issue of the out-of-court identification of the defendant was exhaustively heard by the trial court upon the defendant's motion in limine. Following the hearing, the trial court found as follows in pertinent point:
In my opinion, Ms. Wheeler had sufficient time to observe her assailant. There is nothing which requires that her description to the officers be perfect or in absolute detail. I think that her description of the vehicle and of her assailant was reasonably accurate under the circumstances. Certainly there is nothing in the case to indicate that she was not attentive to the person she accuses of having raped her during that period of time. The time between the crime and the confrontation was not unreasonably long. There appears to be no hesitancy in her identification of the defendant as the assailant and particularly I'm impressed with the fact that she did not just immediately identify the truck as being the truck involved, but she asked to view the right side of the truck, which is the side she observed at the crime scene, and once identifying the truck as being the same truck, then of course it followed that she identified Mr. Ellis as being the person who was driving the truck and assaulted her. I find that that there is no substantial likelihood of any misidentification here. I think there are a number of matters for the jury to consider in evaluating Ms. Wheeler's testimony, but I see nothing to make her in-court identification, if in fact she does identify Mr. Ellis as the person, as being inadmissible. That does not mean that the jury has got to accept it. That means she can be impeached or discredited or her testimony placed in doubt in any way that is permissible under the evidence. But I do think that it is admissible. In fact, I would not be prepared to say that her identification of Mr. Ellis at the showup is inadmissible. The State has agreed not to use it and I think probably wisely so in this case. I think that it meets the standard. And I certainly think that it does not make a subsequent in-court identification inadmissible.
Regarding an improperly suggestive pre-trial identification tainting subsequent identification at trial, this Court evaluates the factors enumerated in Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), to determine whether the in-court identification is "sufficiently reliable to overcome the taint of the prior improperly attained identification." Gayten v. State, 595 So.2d 409, 418 (Miss. 1992). The Biggers factors are:
(1) the opportunity of the witness to view the accused at the time of the crime;
(2) the degree of attention exhibited by the witness;
(3) the accuracy of the witness' prior description of the criminal;
(4) the level of certainty exhibited by the witness at the confrontation;
(5) the length of time between the crime and the confrontation.
Fleming v. State, 604 So.2d 280, 302 (Miss. 1992). Where the trial judge follows these factors and finds that, under the totality of the circumstances, the in-court identification is not impermissibly tainted, this Court will disturb that finding only when there is insufficient substantial credible evidence supporting it. Ray v. State, 503 So.2d 222, 223-24 (Miss. 1986).

*606 3. Additional Facts and Analysis
Without lengthy recitation, the salient facts established at the suppression hearing are these:
(1) Susan D. Wheeler was a 20-year-old student of architecture at Mississippi State University.
(2) The victim was assaulted at 1:20 A.M. On October 4, 1990; the defendant indicated to her that something was wrong with her car and signaled to her stop.
(3) The victim first saw her assailant when he rolled a window down in his truck after matching her pace and speed and coming to a stop in the roadway. She was seated in her vehicle, and the defendant in his own.
(4) The second time the victim saw the defendant was a mile or so from the point where she first saw him. He got out of his vehicle  parked behind her  and was observed by the victim by means of his own headlights.
(5) On the third occasion, the defendant once again alighted from his vehicle and stood first at his truck door. The victim got out of her vehicle to examine the ostensibly offending rear tire, and discovered the defendant then standing at the front of his vehicle by the headlamps.
(7) She described her attacher to a sheriff's officer moments later in ten particulars:
(a) a white male; (b) short brown hair;[5] (c) pointy face, i.e., nose and chin; (d) skinny arms;[6] (e) short-sleeved shirt; (f) a moustache; (g) approximately 5'7" in height, since she was taller than he; (h) a stubbly face, as though he hadn't shaved; (I) estimated weight of 150 pounds; and (j) driving a large brown and beige pickup truck.
(8) The Rankin County Sheriff's deputy recalled receiving from the victim a description of a white male, between 26-30 years of age, height approximately 5'8"  5'10", 140-148 pounds, brown hair and moustache, and driving a brown and tan pickup truck.
(9) The Leake County Sheriff's deputy recalled receiving from the Rankin County Sheriff's Department a "BOLO" of approximately the same description, which he immediately recognized as being that of the defendant, Stanley R. Ellis, whom he had known as long as he could recall.
(10) The victim's description of her assailant was at variance with his driver's license, which listed his height at 5'10", and his weight at 125 pounds; she failed to identify the color of his eyes or a mole on his chin, or whether his hair was wavy as opposed to curly. Nowhere in the record is there any dispute that she is taller than her assailant, which was the basis for her estimation of his height in the first place.
(11) At approximately 4:30 A.M., the victim was shown the defendant and his truck. She first identified the vehicle, then unhesitatingly identified the defendant as the one who sexually assaulted her.
To recapitulate, the testimony of the victim of the nighttime assault amply demonstrated the following:
(1) Opportunity to view the accused: Ms. Wheeler observed the defendant at the time of the assault and immediately preceding it for a period of ten to fifteen minutes;
(2) Degree of attention: She provided the officer with at least ten particulars which specifically characterized the defendant;
(3) Accuracy of prior description: Susan Wheeler identified Stanley Ray Ellis with such accuracy that a deputy sheriff of the defendant's home county knew immediately to whom she referred in her description;
(4) Level of certainty: She identified him without hesitation at the roadside confrontation within a matter of seconds; and
(5) Time elapsed: Approximately three hours had passed between the time Wheeler had been raped by Ellis and when she saw him again on the roadside.
*607 The trial judge employed the Biggers factors and found Wheeler's in-court identification of Ellis admissible. Under the totality of the circumstances, there is substantial credible evidence supporting this finding; therefore, this Court affirms the trial court on this issue.

B. Whether the stop, search, and seizure of Ellis and his vehicle were illegal.

1. The Parties' Contentions
Ellis claims he was stopped without probable cause or reasonable suspicion and that, therefore, his Fourth Amendment rights were violated. Ellis further contends that the length of his stop effected a seizure, which was also illegal; therefore, the flashlight and rifle should not have been admitted. Finally Ellis argues that his consent to the search of his truck was not informed.
The State contends that the description of the truck and assailant was sufficiently accurate to establish probable cause for stopping Ellis. The ensuing search, argues the State, was commenced only after Ellis had been advised of his rights and had signed a consent form.

2. Additional Relevant Facts and Analysis
In Hamburg v. State, 248 So.2d 430 (Miss. 1971), this Court found sufficient probable cause on which to make an arrest where the officer stopped a car meeting the description of the car used by fleeing felons. The officer had received this description via police radio. Hamburg, 248 So.2d at 431-32. After stopping the car, the officer searched it and found narcotics. As to the search, this Court said that a "search of the immediate area surrounding the place of an arrest" is lawful, incident to the arrest. Hamburg, 248 So.2d at 432. This Court recently reaffirmed the reasoning of Hamburg in Curry v. State, 631 So.2d 806, 809-10 (Miss. 1994).
Officer Smith received a "BOLO" which, because of the description of the assailant, led him to look for Ellis. When Ellis' truck was not at Ellis' home, Smith traveled to the area where the assailant was last seen by the victim. Smith found a truck matching the description in the "BOLO." Subsequently, with Ellis at the wheel heading toward Carthage, Smith followed Ellis until backup arrived. At this time, Ellis was pulled over. When Officer Myers arrived, Ellis was advised of his Miranda rights and he signed a consent to search form. Pursuant to Hamburg, the "BOLO" on which Smith relied in stopping Ellis provided sufficient probable cause for an arrest. It follows that this also constitutes probable cause or reasonable suspicion to stop Ellis pursuant to Terry v. Ohio, 392 U.S. 1, 21, 30, 88 S.Ct. 1868, 1879-80, 1884-85, 20 L.Ed.2d 889 (1968). A warrantless search of an automobile is reasonable within the confines of the Fourth Amendment where probable cause exists. McNeal v. State, 617 So.2d 999, 1006 (Miss. 1993). Certainly then, given that Ellis was advised of his rights and that he consented to the search, the search of his truck cannot be found illegal. Evidence obtained as a result of a legal search is subsequently admissible at trial. Michigan v. DeFillippo, 443 U.S. 31, 35, 99 S.Ct. 2627, 2630-31, 61 L.Ed.2d 343 (1979).
The search of Ellis' truck yielded a rifle and a silver flashlight, both of which Wheeler had advised Myers her attacker had in his possession. This evidence, properly obtained, in combination with the "BOLO" provided sufficient probable cause to support Ellis' arrest. As there was no violation of the Fourth Amendment in the stop, search, or seizure, the trial court did not err in admitting the flashlight and rifle into evidence. DeFillippo, 443 U.S. at 35, 99 S.Ct. at 2627, 61 L.Ed.2d 343 (1979). There is no error here.

C. Whether the trial court erred in sustaining the State's motion in limine to exclude the testimony of Dr. Charlton Stanley;

1. The Parties' Contentions
Ellis contends that the trial court should have allowed Dr. Stanley's testimony regarding Ellis' mental health profile. Such evidence would have been helpful to the jury, argues Ellis, because he was accused of the "deviate" [sic] crime of rape. The State argues that Ellis' testimony was not proper expert testimony, would not have been helpful *608 to the jury, and that its exclusion did not prejudice Ellis.

2. Additional Relevant Facts and Analysis
M.R.E. 702 allows testimony by experts when their specialized knowledge will benefit the trier of fact in understanding evidence or in determining a fact in issue. Dr. Stanley's expert testimony would have informed the jury of Ellis' mental health status. Such testimony would not have been helpful to the jury in understanding the evidence presented. Since state of mind or mental health of the accused is not an element of the offense of rape, Stanley's testimony would not have been helpful to the jury in determining any fact in issue. There is no merit to this issue.

D. Whether the trial court erred in allowing Officer Tony Smith's testimony.

1. The Parties' Contentions
Ellis claims that the trial court should have granted his motion in limine and excluded the portion of Smith's testimony which revealed that Smith, upon hearing Wheeler's description of her assailant and his truck, went directly to Ellis' home to see if his truck was there. Ellis contends that the message this sent to the jury was that Smith immediately thought of Ellis as a suspect because of Ellis' involvement in other crimes. The prejudicial effect of this, according to Ellis, outweighed any probative value of this testimony.
The State counters that Smith testified he had known Ellis for almost all of his adult life; therefore, when he received the "BOLO" with the description of Wheeler's assailant and his vehicle, Smith thought of Ellis based simply on the description. Although the truck Ellis was found driving was not the truck Smith expected to find Ellis driving, both trucks fit the general description given by Wheeler. The State did not seek to elicit information regarding other crimes and did not present any such information to the jury. According to the State, Ellis was not prejudiced by Smith's testimony.

2. Additional Relevant Facts and Analysis
At trial, the State first established that Smith had known Ellis "[f]or as long as [Smith could] remember," that Smith knew where Ellis lived, that Smith knew other members of Ellis' family, and that Smith was familiar with Ellis' general description. The prosecutor then asked Smith: "Based on the information that you received from the Sheriff's Department ["BOLO"], where did you go?" When Smith responded that he had gone to Ellis' house, the State asked why. Smith answered: "To see if his truck was at home." Smith continued, in response to questioning, and stated that when he saw Ellis' truck was not there, he drove back toward Carthage. Smith's direct examination went on to cover how and where he found the truck which matched the "BOLO" and the specifics of stopping Ellis.
It appears that the State was showing that the description received by Smith via police radio was sufficient to bring Ellis to mind, Smith had known Ellis for quite some time. The State did not hint at any "other crimes" evidence, either at the suppression hearing or at trial. Other than Ellis' testimony at trial that he had initially lied to Smith about his truck overheating because he did not want to admit to illegally spot-lighting deer, no evidence of other crimes was presented.
Regarding prejudicial versus probative value, the proper test under M.R.E. 403 is whether the probative value of the evidence is substantially outweighed by the risk of undue prejudice. See Jenkins v. State, 507 So.2d 89, 93 (Miss. 1987). The trial judge is given discretion in this M.R.E. 403 balancing task. Id. The probative value of Smith's testimony at issue  that the description on the "BOLO" alerted him to look for Ellis and his truck  is relatively substantial. The risk of undue prejudice  that the jury would assume Smith suspected Ellis because of his involvement in other crimes  is purely speculative. The trial judge did not abuse his discretion in allowing Smith's testimony. Ellis' claim that Smith's testimony was more prejudicial than probative because it sent the jury a message regarding his involvement in other crimes is without merit.

*609 E. Whether the trial court erred in allowing the State, on closing argument, to comment on Officer Tony Smith's testimony.

1. The Parties' Contentions
Ellis claims the prosecutor's remark during closing argument referring to Smith's testimony was inaccurate and prejudicial to Ellis. The State argues that Smith's testimony was properly allowed and not prejudicial; therefore, the prosecutor's comment on such testimony was also proper.

2. Additional Relevant Facts and Analysis
The comment to which Ellis lodged a timely objection at trial is: "The description was sufficiently good that Tony Smith knew where to go to look for the man and the truck. What did he find? They were not there." According to Ellis, this statement was inaccurate because Smith expected Ellis to be driving a rust and beige Ford rather than the brown and beige GMC Ellis was actually driving at the time he was stopped. This argument is disingenuous. Wheeler's description as broadcast in the "BOLO" was of a brown and beige Ford, Chevrolet, or GMC truck. Many people would find that description sufficient to encompass a rust and beige Ford truck. Officer Smith testified that the "BOLO" brought Ellis to mind because he and his truck fit the descriptions given. He drove to Ellis' home and found that the truck he was looking for was not there. Smith properly testified to this effect at trial. It follows that the closing statement concerning his testimony is neither inaccurate nor prejudicial. This Court affirms on this issue.

F. Whether the trial court erred by admitting State's exhibit S-5 into evidence.

1. The Parties' Contentions
Ellis argues that the trial court erred in allowing Ellis' rifle to be admitted into evidence because Wheeler did not identify it as the weapon used by her attacker. Consequently, according to Ellis, admission of the rifle served only to inflame and prejudice the jury without offering any overriding probative value. The State contends that the rifle was properly admitted and offered more probative than prejudicial value.

2. Additional Relevant Facts and Analysis
Ellis' motion in limine to suppress the rifle obtained during the search of his truck was denied. The rifle found in Ellis' truck was admitted into evidence at trial during Officer Myers' testimony. It was Myers who actually searched Ellis' truck and found the rifle. Wheeler, who testified she was not familiar with guns, was not asked to identify the rifle, although she did testify that the gun used by her attacker appeared to be a rifle or a shotgun rather than a pistol. She described the gun as having a long double barrel. Wheeler explained that she had initially described the gun as a shotgun because that was the first type of gun that came to mind in describing a "big" gun rather than a pistol. Ellis himself admitted that, by someone not familiar with guns, his gun could be mistaken for a double barreled gun.
In the case sub judice, the admission of the rifle into evidence may have been prejudicial to Ellis. While use of a gun is not an element which must be proven in a rape case, Wheeler's version of the events included a gun. Admission of the rifle was probative because it was found in the truck of the man identified by Wheeler as her attacker. Wheeler said her attacker had exhibited a gun, and it matched the general description initially given by Wheeler. The rifle provided more probative than prejudicial value and was properly admitted into evidence.

G. Whether the trial court erred by admitting State's exhibit S-3 into evidence.

1. The Parties' Contentions
Ellis claims that the "mug shot" of him should not have been admitted because it was inflammatory, prejudicial, unnecessary, and confusing to the jury. The State responds that the photograph was a fair and accurate likeness of Ellis and was not prejudicial. Further, the State notes that Ellis' only objection to introduction of the photograph was lack of proper predicate.

*610 2. Additional Relevant Facts and Analysis
Mug shot photographs are generally not admissible because they tend to reflect unfavorably on the defendant's character as a result of the implied criminal history. Hewlett v. State, 607 So.2d 1097, 1103 (Miss. 1992); Sloane v. State, 437 So.2d 16, 18 (Miss. 1983). Admission of mug shot photographs must be preceded by three prerequisites to prevent a finding of reversible error:
1. The Government must have a demonstrable need to introduce the photographs; and
2. The photographs themselves, if shown to the jury, must not imply that the defendant had a prior criminal record; and
3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.
Hewlett, 607 So.2d at 1102 (citing Sloane, 437 So.2d at 18).
When the State introduced the mug shot of Ellis at trial, during Officer Myers' direct examination, the following transpired:
Q: All right, in addition to the two officers there was a third person present?
A: Yes sir.
Q: Was that person the person that you see in the photograph?
A: Yes sir.
Q: Is that photograph a fair and accurate depiction of the person as you saw him in the early morning hours of October 4th, 1990?
A: Yes sir.
Q: Does that appear to be an accurate representation of what you saw?
A: To the best of my knowledge, yes sir.
Q: Do you know what this photograph is called in the sheriff's department, what do you refer to this as?
A: We call it a mug shot.
MR. LACY [Prosecutor]:
At this time we would like to have this marked as State's exhibit into evidence.
MR. RAINER [Defense attorney]:
Objection. The proper predicate has not been laid.
BY THE COURT:
Let me see counsel at bench.
**BENCH CONFERENCE HELD OFF RECORD**
MR. LACY:
We would move this in evidence so I can ask him some additional questions about it.
MR. RAINER:
Objection.
BY THE COURT:
I want him to identify as to who it is.
MR. LACY CONTINUES:
Q: Do you know, officer, of who that is a photograph?
A: This photograph is of Stanley ...
MR. RAINER:
Object.
BY THE COURT:
Overrule.
MR. LACY CONTINUES:
Q: Who is that a photograph of?
A: Stanley Ellis.
Q: And where did you see the person depicted in this photograph, if you saw him at all on October 4th, in the early morning hours of 1990, where did you see him, if you did?
A: I saw him on highway sixteen in the City Limits of Carthage with the two previous officers that I mentioned.
MR. LACY:
Your Honor, at this time we would move State's Exhibit Four (4) into evidence.
BY THE COURT:
Let me see counsel at bench.
**BENCH CONFERENCE HELD OFF RECORD**
MR. LACY CONTINUES:
Q: Mr. Myers, does the photograph fairly and accurately depict the person that you have named as you saw him on the night of October 4, 1990?
A: Yes sir.
MR. LACY:

*611 Your Honor, at this time we move the photograph into evidence.
MR. RAINER:
Objection.
BY THE COURT:
Overruled. It will be received and marked as the State's next exhibit.[7]
This photograph was marked as State's Exhibit 3 and evidently went to the jury. Although the prisoner identification numbers had been removed from the photograph, the jury was aware that this was a mug shot because Myers identified it as such. However, this did not imply a prior criminal record because Myers also testified that the photograph was taken after Ellis' arrest for this charge of rape.
The manner of introduction at trial clearly drew attention to the source of the photograph  Myers identified it as a mug shot taken when Ellis was arrested on this charge of rape. The foremost reason mug shots are inadmissible  because they tend to imply a prior criminal record of the defendant  is not present here, because the jury was informed that this photograph of Ellis was taken at the time of his arrest on this particular charge. See Hewlett, 607 So.2d at 1103; Sloane, 437 So.2d at 18. It follows that introduction of this photograph is not reversible error.

H. Whether the overwhelming weight of the evidence was against the verdict of the jury.

1. The Parties' Contentions
Ellis lists as evidence weighing against the jury's verdict his denial of the rape, his alibi, the physical traits of Ellis which do not match the description provided by Wheeler, the fact that the truck described by Wheeler and driven by Ellis was common in the Carthage area, the inconsistencies in Wheeler's telling of the facts, the discrepancies between Wheeler's descriptions of the flashlight and gun and Ellis' flashlight and rifle, the fact that Wheeler did not identify Ellis' rifle, and the fact that Wheeler was calm following the rape. The State contends that the jury's verdict is supported by substantial credible evidence and all reasonable inferences flowing from such evidence.

2. Additional Relevant Facts and Analysis
When this Court considers whether the jury's verdict is against the overwhelming weight of the evidence, it accepts as true all evidence supporting the verdict. Isaac v. State, 645 So.2d 903, 907 (Miss. 1994), quoting Thornhill v. State, 561 So.2d 1025, 1030 (Miss. 1989). Reversal is warranted only when this Court is convinced there was an abuse of discretion in the circuit court's denial of a new trial. Id.
Evidence supporting the verdict of guilt in the instant case consists entirely of Wheeler's testimony and her identification of Ellis. Despite some discrepancies, Wheeler testified that her attacker exhibited a long-barreled gun and a silver flashlight; Ellis had in his possession, at the time of his arrest, a long barreled gun and a silver flashlight. Ellis was driving a truck which matched the general description provided by Wheeler. Moreover, he was found, just hours after the rape, in the same general vicinity as there where Wheeler said the rape occurred. Despite some discrepancies between her description of the attacker and Ellis' physical attributes, Wheeler was certain in her identification of Ellis at trial. There were no additional witnesses to Wheeler's rape and no physical evidence proving the crime charged. Accepting Wheeler's testimony and identification of Ellis as true, a verdict of guilt is sufficiently supported. These errors are denied.

I. Whether the trial court erred in refusing to grant a directed verdict in favor of Ellis.
Ellis contends that the State's proof failed to make out a case of rape because of the lack of corroborating physical or testimonial evidence and because Wheeler's actions following the rape were inconsistent with what would be expected of someone who had just *612 been raped. The State replies that the evidence is presented is more than sufficient to make out a prima facia case of rape.

1. Additional Relevant Facts and Analysis
Regarding the motion for directed verdict, the trial judge must accept as true all evidence favorable to the State and all reasonable inferences flowing therefrom. Evidence favorable to the defendant must be disregarded. Isaac, 645 So.2d at 907, quoting Noe v. State, 616 So.2d 298, 302 (Miss. 1993). When considered in this light, the evidence is sufficient to support the jury's verdict; therefore, the motion for directed verdict was properly overruled. Id.
Despite the lack of corroborating physical evidence and additional eyewitnesses, the evidence favorable to the State is sufficient to support a verdict of guilt. Because Wheeler's in-court identification of Ellis was proper, the trial judge did not err in failing to grant Ellis' motion for directed verdict.

IV. CONCLUSION
Finding no merit in any assignment of error, this Court affirms the conviction and sentence of Stanley Ray Ellis.
CONVICTION OF RAPE AND SENTENCE OF TWENTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, PAYMENT OF COURT COSTS, FEES AND ASSESSMENTS AFFIRMED.
HAWKINS, C.J., PITTMAN, BANKS and JAMES L. ROBERTS, Jr., JJ., concur.
SULLIVAN, J., dissents with separate written opinion joined by DAN M. LEE, P.J., and McRAE, J.
SMITH, J., not participating.
SULLIVAN, Justice, dissenting:
I respectfully dissent from the conclusion reached by the majority in this case. In my view it was error for the trial court to fail to suppress the in-court identification of Ellis. I believe the roadside identification was grossly suggestive and, under the totality of the circumstances, there was not substantial credible evidence supporting the trial court's finding of admissibility.
Wheeler described her attacker as a skinny white male, about five feet seven inches, 150 pounds, with short brown hair cut over the ears, curly in back, a pointy face, chin, and nose, and a mustache. Wheeler testified she told the officer the man was "[a]bout this much" shorter than she, and the officer came up with 5'7". Myers testified Wheeler had described her attacker as five feet ten inches. Myers had previously testified that Wheeler estimated her attacker's height as three or four inches shorter than herself. Myers further testified that Wheeler said her attacker wore boots. Wheeler described the truck as a big pickup truck, about 1980, brown on top and beige on the bottom, either a Ford, Chevrolet, or GMC. Wheeler also advised Myers that she last saw her attacker traveling north on Highway 25. Myers put out a "bolo"  be on the lookout  for a truck and driver fitting the descriptions given by Wheeler.
While Wheeler was talking to Myers, Mary Covert arrived at the BP station and called Wheeler's boyfriend, Scott Weatherall. Wheeler and Covert then drove to River Oaks Hospital in Flowood, where Wheeler was examined and a rape test kit was taken. When the rape test kit was complete, Wheeler was informed that law enforcement authorities had apprehended her attacker.
Tony Smith, of the Leake County Sheriff's Department, received the "bolo" at home at about 2:00 a.m. and thought it described Stanley Ellis, whom Smith had known for as long as he could remember. Smith went directly to Stanley Ellis's home to see if his truck was there. When it was not, Smith drove south on Highway 25, looking for a large brown and beige pickup truck. At the Leake-Scott County line, Smith noticed a truck fitting the description, with its flashers on, parked on the side of the highway. After determining that no one was inside the truck, Smith reported his finding to the Rankin County Sheriff's Department via the Carthage Police Department. Smith then drove north on 25 to an exit, turned around and headed south again, and met the truck he had just seen, now being driven north on *613 Highway 25. Smith turned around and drove behind the truck, advised the Carthage Police Department of his actions, and kept following the truck while waiting for a Rankin County unit as promised by the Carthage Police. While following the truck toward Carthage, Smith radioed for a Carthage Police officer to assist him in a stop on Highway 16 in Carthage. Officer Jeff Edwards of the Carthage Police Department responded. When he and Smith turned on their blue lights, the pickup truck driver pulled over.
Myers, at the direction of his dispatcher, drove to Leake County, where he met Officers Smith and Edwards of the Carthage Police Department. Stanley Ellis was with the two officers on Highway 16 in Carthage. Myers thought Ellis matched the description he had received from Wheeler, except for the difference in weight and that Ellis had straight hair. Myers testified that Ellis had on boots and a short sleeved shirt at the time of his arrest, as described by Wheeler.[1] Myers told Ellis why he was there, advised him of his Miranda rights, and obtained a consent to search Ellis's vehicle, a brown and beige pickup truck. The search yielded a twenty-two automatic rifle and a small chrome or silver flashlight. The rifle obtained in the search does not have two barrels, but at trial Myers denied that Wheeler had described the gun to him as double-barreled. Ellis's flashlight is smaller and lighter than the one described by Wheeler at trial; Myers claimed Wheeler's description of the flashlight to him was merely that it was silver or chrome. Ellis was taken into custody and returned to Rankin County.
At about 9:00 a.m. October 4, 1990, after Ellis was arrested, Wheeler gave a statement to Officer Ronnie Pennington of the Rankin County Sheriff's Department. Pennington subsequently advised Ellis of his rights and took, with Ellis's cooperation, blood, head, and pubic hair samples for a rape test kit and also took Ellis's clothing for testing.
At trial, Ellis's mother and father testified that their son had left their home at about 7:00 p.m. on October 3, with his brother and a friend, to do some work on Ellis's 1981 brown and beige GMC pickup truck. Randy Boatner, who helped Ellis work on his truck that night, testified that at about 10:30 or 11:00 that night he and Ellis drove Ellis's newly repaired pickup truck to the Junior Food Mart in Canton. After purchasing gasoline and cigarettes, the two drove through Twin City, approximately five miles south of Carthage, then to Edinberg, about ten miles away, and back to Carthage. Ellis then dropped Boatner off at Boatner's father's house, about three to five miles from Ellis's home, at about 1:10 a.m. Boatner's stepmother corroborated the time Boatner arrived at his father's home. Warren Tate, a neighbor of Ellis, measured the distance from the Boatners' home to the spot of the rape as twenty-nine miles by vehicle. It took Tate thirty-two minutes to travel that distance.
Ellis took the stand in his own defense and testified he did not rape Susan Wheeler. After leaving Boatner at Boatner's father's house, Ellis drove north on Highway 35 to a convenience store, then realized he did not have a check with him and could not make the purchases he had planned to make. Ellis turned around and headed south on Highway 35, toward Pine Tree Grocery, to wash his truck. After washing his truck, at about 2:00 a.m., he left Pine Tree Grocery and drove south on Highway 25 to scout for deer in an area where he had previously hunted deer. When he got to within a mile of this area, he stopped to take a shot at a deer he saw on the side of the road. He then turned around by driving down into the ditch and drove north to a convenience store where he purchased a Coke from a vending machine. Next, Ellis returned to the spot where he had just shot at the deer and pulled over on the shoulder of the highway, turned his flashers on, and left the road to look for the deer with his flashlight. Ellis estimated that this happened at about 2:30 or 2:45 a.m. He stayed in the woods for about fifteen minutes, then noticed a deputy driving by on the highway.
*614 This deputy turned around and drove back, stopping behind Ellis's truck briefly, then drove on toward Carthage. Ellis then came out of the woods, got into his truck, and drove toward Carthage. He soon met the deputy, who had turned around and was now driving south, toward Ellis. After passing Ellis, the deputy again turned around and followed Ellis into the city limits of Carthage, at which point he turned on his blue lights and Ellis pulled over.
Ellis told Officer Tony Smith that his truck had been running hot and he was parked on the side of the highway earlier to get some water, for his engine, from the ditch. Ellis admitted at trial that he had lied to Smith, but only because he did not want to admit to illegal deer hunting. Ellis further testified that he was five feet ten inches tall, about one hundred twenty-five pounds, with slightly wavy, but not curly, hair. He claimed ownership of both the flashlight and the rifle taken from his truck and entered into evidence; the rifle is the gun he used to shoot deer. Ellis admitted that to someone who was not familiar with guns, his twenty-two rifle might be described as double-barreled.
Wheeler testified that she had seen her attacker clearly the third time he stopped her, when she was behind her car. Wheeler identified Stanley Ellis at his trial and also identified his flashlight and a photograph of his pickup truck. An examination of the rape test kits and of Wheeler's and Ellis's clothing revealed: no head or pubic hair of Ellis on Wheeler's person, clothing, or undergarments; no fibers from Wheeler's clothing on Ellis's clothing nor vice versa; no traces of Wheeler's blood or saliva on the person or clothing of Ellis's nor vice versa; and no traces of semen in Wheeler's vaginal canal, person, or clothing nor on Ellis' person or clothing. Wheeler exhibited no bruises or scratches on her person.
Although Wheeler had written down the mileage from her odometer at the scene of the rape, she was later unable to pinpoint the area for law enforcement officers. No boot or shoe prints were found in the general area where the rape occurred even though Wheeler and her attacker had walked some fifteen or twenty feet into the woods. While tire tracks were discovered on the side of the road in the area where the rape occurred, the State made no attempt to prove that these tracks matched the truck driven by Ellis.

THE LAW

A. Whether the trial court erred by failing to suppress the in-court identification of Ellis by the victim because the roadside identification was so impermissibly suggestive that it gave rise to a very substantial likelihood of irreparable misidentification.

1. The Parties' Contentions
Ellis argues his roadside identification by Wheeler was impermissibly suggestive because Wheeler was told, before she was asked to identify Ellis, that her attacker had been apprehended. No other "suspects" were presented to Wheeler at this time. Ellis was also not afforded an attorney at this point, although he was held for an hour and a half while waiting for Wheeler to identify him, therefore Ellis claims the State was required to clearly and convincingly show that Wheeler's in-court identification of him was based upon observations of him other than those made at the roadside identification.
The State responds that the roadside identification was not impermissibly suggestive and that there was a sufficient independent basis for Wheeler's identification of Ellis.

2. Additional Relevant Facts and Analysis
The roadside identification of Ellis lends itself to considerable doubt. Just after her hospital examination and rape test kit were completed, Wheeler was informed that law enforcement officials had apprehended her attacker. She was then taken to the same highway where she had been attacked and was presented with one man and one truck. When asked if the truck was the one driven by her attacker, Wheeler first examined the passenger side of the truck, then positively identified it. At the suppression hearing Wheeler noted that the color, window tint, and toolbox in the bed were distinguishing features, in addition to the color. She was *615 next asked if the man (Ellis) was her attacker. Wheeler identified him immediately as her attacker, although she admitted on cross-examination, at the suppression hearing, that she did not know what color eyes Ellis or her attacker had and did not know whether either had a mole on his face. Wheeler also did not remember much about the clothing her assailant was wearing except that he wore a short-sleeved shirt because she noticed his skinny arms. In fact, Ellis wore a hot neon pink colored T-shirt at the time of his arrest. Ellis' motion to suppress an in-court identification of him by Wheeler was denied and Wheeler subsequently identified Ellis at trial as her assailant.
Regarding an improperly suggestive pre-trial identification tainting subsequent identification at trial, this Court evaluates the factors enumerated in Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), to determine whether the in-court identification is "sufficiently reliable to overcome the taint of the prior improperly attained identification." Gayten v. State, 595 So.2d 409, 418 (Miss. 1992). The Biggers factors are:
(1) the opportunity of the witness to view the accused at the time of the crime;
(2) the degree of attention exhibited by the witness;
(3) the accuracy of the witness' prior description of the criminal;
(4) the level of certainty exhibited by the witness at the confrontation;
(5) the length of time between the crime and the confrontation.
Fleming v. State, 604 So.2d 280, 302 (Miss. 1992). Where the trial judge follows these factors and finds that, under the totality of the circumstances, the in-court identification is not impermissibly tainted, this Court will disturb that finding only when there is insufficient substantial credible evidence supporting it. Ray v. State, 503 So.2d 222, 223-24 (Miss. 1986).
Wheeler had ample opportunity to observe her attacker prior to the rape. Although it was dark, she had seen her attacker when he rolled his window down the first time he pulled her over and again on the two subsequent stops when he got out of his truck, for a total of about ten or fifteen minutes before the attack. The degree of attention exhibited by Wheeler weighs against admissibility of the in-court identification. Unlike an undercover officer intent on attending to details with a view toward future identification of the accused, Wheeler was not sure what clothing her attacker wore or what color eyes he had. Also, her description of the attacker was inaccurate on major features. Wheeler described her assailant as having short curly brown hair cut over his ears, a pointy face and chin, mustache, skinny arms, short sleeved shirt, about five feet seven inches tall and weighing one hundred fifty pounds. Ellis's brown hair is rather straight, he is five feet ten inches tall and he weighs one hundred twenty-five pounds. On cross-examination, Myers testified that a photograph taken at the time Ellis was arrested revealed hair that was long and straight in the back. Further, Ellis sports a rather distinctive mole on his chin which Wheeler never mentioned. Nonetheless, her description was evidently accurate enough that it caused Tony Smith to immediately look for Stanley Ellis.[2] At the pre-trial identification, which occurred only a few hours after the rape, Wheeler was completely certain that Ellis was her attacker, but she identified him only after she had identified his truck.[3] Again at trial, one year after the rape, Wheeler was certain in her identification of Ellis.
Under the totality of the circumstances, the in-court identification of Ellis was impermissibly tainted by the previous roadside identification. Weighing on the side of inadmissibility of the grossly suggestive roadside *616 identification are Wheeler's lack of attention and the inaccuracy of her description. Factors tending to overcome the taint are the extended opportunity Wheeler had to observe her attacker, the level of certainty in Wheeler's identification of Ellis, and the short period of time between the crime and the confrontation. However, Wheeler's certainty in identification of Ellis is eroded to some extent because her identification of Ellis seems grounded on her identification of his truck. Regarding her identification of the truck, Wheeler vacillated.
The trial judge employed the Biggers factors and found Wheeler's in-court identification of Ellis admissible. Under the totality of the circumstances, there is not substantial credible evidence supporting this finding; and therefore, this Court should reverse the conviction and sentence.
DAN M. LEE, P.J., and McRAE, J., join this opinion.
NOTES
[1] Wheeler previously testified that the truck's windows were tinted so darkly that she couldn't see through them.
[2] At the bond hearing, Wheeler testified that her headlights were off at this time.
[3] This is a radio term used by law enforcement officers meaning "be on the lookout" for a person or thing.
[4] The State had in its possession, at the time of trial, all clothing worn by Ellis except the boots. Testimony that Ellis wore tennis shoes on the night of Wheeler's rape was presented by the defense.
[5] There is some disagreement as to whether she informed the officer that the appellant had curly brown hair or wavy hair.
[6] The victim testified "I could tell because he had on a short sleeve shirt. I looked ... I remember a picture in my head looking at his arm and it was skinny.
[7] Ellis' original brief to this Court notes that, during the bench conference, the photograph was clipped to remove the Sheriff Department's prisoner identification. This photograph does not appear in the record; Ellis' reply brief explains that this exhibit has been lost.
[1] The State had in its possession, at the time of trial, all clothing worn by Ellis except the boots. Testimony that Ellis wore tennis shoes on the night of Wheeler's rape was presented by the defense.
[2] It was evidently not the description of the truck which caused Smith to look for Ellis as the truck Ellis was driving when he was found is not the truck Smith expected him to be driving.
[3] Officers who testified at the suppression hearing admitted that the truck described by Wheeler, including the make, model, and color, was common in the area. At the preliminary hearing, Wheeler misidentified Ellis's truck in photographs. At the suppression hearing, Wheeler declined the invitation to identify Ellis's truck in photographs. She did, however, identify a photo of Ellis's truck at trial.