679 So.2d 1041 (1996)
Christy HENSON and Kevin Henson
v.
Steven B. ROBERTS.
No. 92-CA-00841-SCT.
Supreme Court of Mississippi.
January 25, 1996.
Rehearing Denied September 5, 1996.
V. Douglas Gunter, Jackson, for appellant.
Philip W. Gaines, Frances R. Shields, Currie Johnson Griffin Gaines & Myers, Jackson, for appellee.
En Banc.
SMITH, Justice, for the Court:
Christy and Kevin Henson filed a Complaint in the Circuit Court of the First Judicial District of Hinds County alleging that *1042 personal injuries and loss of consortium resulted from an accident occurring on June 6, 1990. Steven Bradford Roberts [Brad], while driving his 1985 4-wheel drive blue Toyota pick-up truck, struck Christy's 1981 silver Datsun automobile almost head-on. The primary liability issue at trial was which driver was in the wrong lane at the time of the collision. The jury returned its verdict in favor of Brad. Christy and Kevin appeal to this Court the following issues:
I. WHETHER OR NOT THE TRIAL COURT ERRED IN REFUSING CHRISTY'S J.N.O.V. MOTION OR, IN THE ALTERNATIVE, A MOTION FOR A NEW TRIAL BECAUSE THE 10-2 JURY VERDICT WAS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE.
II. WHETHER OR NOT THE TRIAL COURT ERRED IN OVERRULING CHRISTY'S MOTION TO EXCLUDE THE TESTIMONY OF OFFICER JORDAN'S CONVERSATION WITH CHRISTY CONCERNING THE ACCIDENT REPORT.
III. WHETHER OR NOT THE JURY WAS PREJUDICED BY BRAD'S COUNSEL'S QUESTIONING OF RICHARD SPRING.
We find that only Issue I is worthy of discussion. After thorough review, we find the disputed facts were properly left to the discretion of the jury. A reasonable hypothetical juror could have returned a verdict as this jury did. We must affirm the lower court.

FACTS
Christy worked at her father's KEA store on Siwell Road which is located on the left side of Siwell Road as she was traveling westward. On the day of the accident she had forgotten her purse and was returning to the store to retrieve it. As Christy approached the KEA store, she came to a curve, which curved to her right, and the KEA store was on her left. Christy testified that she had come to a complete stop in front of the driveway of the KEA store, and that she remembered "sitting there being  it wasn't quiet a minute. It was a good few many seconds, and then the next thing I know it had been a crash." She said that she did not remember the blue vehicle coming toward her, that she had pressed the clutch and brakes, and that her wheels were facing forward. At trial, the defense called the officer who investigated the accident, James Jordan, to testify as to what he observed at the scene. He did not find anyone at that time who actually saw the collision. He did, however, briefly talk to Christy. He testified that Christy said she was "sitting still turning into the KEA, and she didn't see the oncoming vehicle." Later, under redirect, Jordon said "she was turning in and she just didn't see the vehicle coming in front of her and she had an accident."
Christy suffered injuries that included two teeth being knocked out, her lips torn apart, damage to her right elbow and left wrist, as well as knee damage that required two surgeries. She had around 200 stitches in total to repair the damage and had medical bills totaling $21,402.36.
At the time of the accident, Brad and his friend were traveling to his mother's home in Florence. He was a student in polymer science at the University of Southern Mississippi. His passenger, Cindy Whirlow, remembers leaving the house, but she was thrown out of the truck on impact and suffered a blow to the head. She does not remember anything else concerning the circumstances of the accident.
Brad described the location of the accident site. Going east on Siwell Road, he first passed Big Creek intersection and then Davis intersection. Brad testified that "as you near Davis, probably almost a ninety degree turn occurs right in front of the KEA store." He stated, "I saw her car traveling toward me, glanced back to the road, looked back again to the car as I neared, as I came right up upon it, then looked back up the road again as I came out of the curve, and then I felt the impact." He said that the last time he saw the silver car, it was still moving. He stated that as he entered the speed zone, he slowed down between thirty-five and forty, and then, as he entered the curve, he took his foot off the gas again. He does not *1043 remember seeing Christy turn left in front of him. The speed limit just before the accident site was forty-five miles per hour and then it drops to thirty-five miles per hour at the site of the accident.
Christy called four people who were at the accident site: Debbie Fuller, Michael Fuller, Richard Spring, and George Hollingsworth.
At the time of the accident, Debbie and Michael Fuller were driving behind Brad, having pulled onto Siwell Road from Big Creek Road. When the accident happened, Debbie testified that she saw the blue truck coming up the road, but did not turn onto Siwell Road because "he was going too fast for me to pull out in front of," but said she could not speculate as to Brad's rate of speed. She saw the truck flip in the air, but did not see who was in the wrong lane. Christy's attorney had a diagram of the accident site where he had each of the witnesses place the location of Christy's car after the crash. This placement was important for accident reconstruction purposes. Debbie Fuller placed the car on the diagram and Christy's attorney photographed it.
Michael Fuller estimated that Brad was driving at about fifty to fifty-five miles per hour. He was the first witness to mention the controversial gouge mark in the road. This gouge mark, which, by the time of the trial, was apparently one of the several paved over spots on the road, was used by both accident reconstructionists in their reconfigurations of the accident. The controversy arises over what exactly caused the gouge mark and where exactly the mark was located. Christy's position is that the gouge was caused by the front portion of Brad's truck when it flipped. Brad attributes the gouge to the place in the road where Christy's vehicle was pressed down by the force of Brad's truck running over the top of the front hood edge.
Richard Spring finished work about 4:00 p.m., bought some beers at the KEA, and was sitting on a picnic table in a pavilion near the store drinking "probably" his second beer at the time of the collision which was at 7:40 p.m. He looked out to the road and saw Christy's car sitting in the road and saw another car going by her, which signified that she was stopped and in the proper lane. He testified that there was a crash and Christy's car was knocked back some twenty feet. The defense claims that from where he was sitting, Richard Spring was behind the store and could not even see the accident. The defense attorney also asked Spring about a statement he had made to the defense attorney's paralegal. He asked Spring if he told the paralegal that "the lawyers [Christy's] keep trying to get me to say I saw the blinker [turn signal] on," but that he could not say that because he could not see the blinker. Spring said that no, he was really saying that Christy's lawyers had asked him if he saw the blinker on. In Christy's appeal she argues that these were mudslinging tactics and were improper.
George Hollingsworth, a witness not discovered until a couple of weeks before trial, was standing outside the door of the KEA store when he saw "a blue pickup come through there ... and he ran into Christy right there at the intersection at the store." He confirmed Christy's story that she had been stopped waiting to turn for thirty seconds or more and that she had not yet attempted to make a left turn. He testified that he thought Brad was going about sixty miles per hour when he hit Christy. Hollingsworth said that he could not see the yellow line dividing the road but that he had seen another car pass by before the blue truck did and that is how he knew that Christy was on her side of the road.
John Neil, Christy's accident reconstructionist who had participated in five investigations, examined the scene of the accident and the car approximately two years after the accident. He placed the now patched gouge seventeen and one-half feet away from the edge of the entrance to the KEA driveway (the lane in which Christy was traveling). He did not consult the on-the-scene investigating officer, James Jordan. He looked at the car, studied the accident site, and talked to the aforementioned witnesses and Christy's lawyer. He also testified that the left front wheel of the vehicle was frozen forward and maybe turned just a little bit to the left.
*1044 James Jordan investigated the accident immediately after it happened. He made a drawing of the positioning of the vehicles at that time. He identified the gouge mark in the oncoming lane (the one closest to the KEA entrance and the lane in which Brad was traveling) as the place where they collided and said that the mark was caused by Christy's car in that collision. However, he did not put this gouge mark location in his report. Jordan also testified that Christy had approached him at the KEA store well after the accident, saying that the accident was not her fault and that she "had some doctor bills and she wasn't going to be able to pay them; that she wanted me to reconsider my report  correcting the report, as far as finding her at fault."
Christy made a motion to keep this damaging information away from the jury, and the judge granted it in part and denied it in part. The trial judge disallowed any reference to "insurance" because Christy had told the officer that she needed the report changed to get insurance money, but allowed the testimony mentioned above. Christy cites this as prejudicial, reversible error.
Cecilia Kazery, Brad's accident reconstructionist, was a trooper with the Mississippi Highway Patrol and had investigated fifteen to twenty accidents. She stated that she had never heard of a situation where the reconstructionist did not consult with the investigating officer, except for the present situation. She testified that she based her information on Officer Jordan's report and pictures taken just after the accident. Her testimony reflected that the gouge mark was Brad's lane, not the Christy's and that meant that the point of maximum engagement was in Brad's lane. Kazery testified that that Christy was trying to make her left turn to go into the KEA store. The truck's final resting position was not that far away from impact and this meant there was not a lot of speed involved. The position of Christy's car showed there was forward movement since she rotated back into Brad's lane. She said that if Christy had been sitting still, Brad's pickup would have knocked her back a different way. Kazery said that no one knows exactly where the vehicles came to rest after the accident and that limited her ability to be specific.

DISCUSSION OF LAW

I. WHETHER OR NOT THE TRIAL COURT ERRED IN REFUSING CHRISTY'S J.N.O.V. MOTION OR, IN THE ALTERNATIVE, A MOTION FOR A NEW TRIAL BECAUSE THE 10-2 JURY VERDICT WAS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE.
Christy asks this Court to reverse the jury's verdict and remand for a trial just on damages, or in the alternative, grant a motion for a new trial. When evaluating the J.N.O.V. motion, this Court has held that it would apply the same standard to a J.N.O.V. motion as to a motion for directed verdict made at the close of all the evidence. James v. Mabus, 574 So.2d 596, 600 (Miss. 1990); Turner v. Turner, 524 So.2d 942, 944 (Miss. 1988); Upton v. Magnolia Elec. Power Ass'n, 511 So.2d 939, 943 (Miss. 1987). Christy argues that since all her witnesses placed the location of her automobile after the accident west of the gouge mark, then this mark could not have been made by her car but was instead caused by metal protruding from the front of the pickup when it slid down the top of Christy's car and flipped. Brad counters claiming that the gouge used by Neil for his measurements and reconstruction was actually a randomly selected tar patch among many present on the roadway. Brad presents evidence of a different gouge mark on the road, including photos taken soon after the accident which show "a scrape going from the gouge mark to the wheel of Christy's car along the line the wrecker dragged the car off the road." This Court has held that
[t]he evidence is considered in the light most favorable to the non-moving party, giving that party the benefit of all favorable inferences that reasonably may be drawn therefrom. Andrew Jackson Life Insurance Co. v. Williams, 566 So.2d 1172, 1177 (Miss. 1990); Goodwin v. Derryberry Co., 553 So.2d 40, 42-43 (Miss. 1989). If the evidence is sufficient to support a verdict *1045 in favor of the non-moving party, the trial court properly denied the motion. Cummins v. Century 21 Action Realty, Inc., 563 So.2d 1382, 1386 (Miss. 1990); Goodwin v. Derryberry Co., 553 So.2d 40, 42-43 (Miss. 1989).
James, 574 So.2d at 600. In this case, Brad presented sufficient evidence and raised questions as to the reliability of Christy's evidence, so the trial court properly denied the J.N.O.V. motion.
A motion for a new trial challenges the weight of the evidence. James, 574 So.2d at 600; Cummins v. Century 21 Action Realty, Inc., 563 So.2d 1382, 1386 (Miss. 1990). In a case such as the present one, cold, concrete facts about which there are no disputes are few and far between. An accident occurred. The essence of two witnesses' testimonies was that it was Brad's fault. The investigating officer made some notes on the accident which contradicted this position. Christy's accident reconstructionist did not consult with this officer who responded to the notification of the accident.
The jury heard all this evidence from the witnesses, not from a transcript. This Court has stated that:
The demeanor or bearing, the tone of voice, the attitude and appearance of the witnesses, all are primarily for inspection and review by the jury. The jury not only has the right and duty to determine the truth or falsity of the witnesses, but also has the right to evaluate and determine what portions of the testimony of any witness it will accept or reject; therefore, unless it is clear to this Court that the verdict is contrary to the overwhelming weight of the credible testimony, this court will not set aside the verdict of a jury.
Wells Fargo Armored Service Corp. v. Turner, 543 So.2d 154, 156 (Miss. 1989) (quoting Travelers Indemnity Co. v. Rawson, 222 So.2d 131, 134 (Miss. 1969)). This Court has stated that the test applied to a jury verdict is:
Once the jury has returned a verdict in a civil case, we are not at liberty to direct that judgment be entered contrary to that verdict short of a conclusion on our part that given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found.
Wells Fargo Armored Service Corp. 543 So.2d at 157; Bell v. City of Bay St. Louis, 467 So.2d 657, 660 (Miss. 1985); Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); Weems v. American Security Insurance Co., 450 So.2d 431, 435 (Miss. 1984). When the facts are in dispute as they are in this case, the jury is given the power to resolve factual disputes and this jury did so in favor of Brad. A "reasonable, hypothetical juror" could have returned a verdict as this one did. When evidence is in dispute and different conclusions could be reached, the Court "has refused to take an issue from the jury or to interfere with a jury's decision." McKinzie v. Coon, 656 So.2d 134, 140 (Miss. 1995).

CONCLUSION
The evidence was sufficient to support the verdict of the jury. The jury properly resolved the disputed facts in favor of Brad Roberts. Accordingly, this Court refuses to take the issue from the jury. We affirm the lower court's order denying the motion for a new trial or J.N.O.V.
JUDGMENT AFFIRMED.
PRATHER and SULLIVAN, P.JJ., and PITTMAN, BANKS, JAMES L. ROBERTS, Jr. and MILLS, JJ., concur.
McRAE, J., dissents with separate written opinion.
DAN M. LEE, C.J., not participating.
McRAE, Justice, dissenting:
We generally afford jury verdicts great deference and will not set such a verdict aside "unless the jury is improperly instructed on the law, mislead, confused or ignores the weight of the evidence." McKinzie v. Coon, 656 So.2d 134, 142 (Miss. 1995). In this case, the verdict is contrary to the overwhelming weight of the evidence and suggests that the jury was misled. A new trial should be granted. Accordingly, I dissent.
This case arises from a collision between vehicles driven by Brad Roberts and Christy *1046 Henson in front of a KEA store on Siwell Road in South Jackson. The major liability issue at trial was which party was in the wrong lane at the time of the nearly head-on crash. Although many of the facts are controverted, eyewitness testimony places Henson's vehicle in the proper lane. Only a gouge mark in the pavement, one of several repaved spots at the accident site, would support Roberts' contention that the collision occurred in his lane. The identification of the mark and its attribution to Henson's car was made by the investigating officer, James Jordan, who had not made any note of the mark in his accident report, but remembered it two years later. The parties' accident reconstructionists had differing explanations for the gouge mark.
Pivotal to this case is the identification of a gouge mark in the road which arguably places Christy Henson in Brad Robert's lane at the time of the accident, despite the testimony of the parties and eyewitnesses to the contrary. As Henson recalled:
I had come up to where the driveway was and I had come to a complete stop, and I had to wait because it was a lot of traffic that night because of softball tournaments and church, a lot of traffic. I can remember sitting there being  it wasn't quite a minute. It was a good many seconds, and the next thing I know it had been a crash.
Roberts, asked when he first saw Henson's vehicle, responded:
A. Well, I saw her car as I neared the curve still on the straightaway moving toward me in her lane in the opposite direction. And then I glanced back to the road and then I glanced back to her car again. I still never saw a blinker. I looked back to the road and then I felt the impact.
Q. Did you see her turn in front of you?
A. No, sir, I did not.
Q. Did you ever tell Deputy Jordan that she turned [in] front of you?
A. I may have afterwards when I was sitting beside my truck with my girl-friend on the ground unconscious with her car sitting straddled across the middle of the  across the yellow lane.
Q. You also told me in this deposition that if you did tell deputy Jordan that later on, it was because of what you learned later on.
A. It was because of what I saw of her car.
Q. But you never saw her turn in front of you and try to make a short cut into the KEA?
A. No, sir.
Richard Spring, a patron at the KEA store who was sitting on a picnic table with a full view of the accident scene, testified that before the crash, Henson's car "was sitting there, just sitting there, like she was getting ready to turn into the store." He further testified that after the accident, he looked around and saw no "slide marks" in the pavement.
Another patron, George Hollingsworth, described for the jury what he had observed:
A. I was standing just outside the northeast door of the building and I heard some tires roaring and I looked up to see what was going on and it was a car came off of Davis Road and went on to Siwell Road, and then a blue pickup come through there  that was the tires I heard  and he ran into Christy right there at the intersection of the store.
Q. Uh-huh. What caused you to notice the pickup?
A. The roaring of those big tires on it.
* * * * * *
Q. And prior to the collision, did you see Christy's automobile and where it was positioned?
A. She had been sitting out there waiting to turn in for probably 30 seconds.
* * * * * *
Q. Did you observe her for that period of time, for approximately 30 seconds?
A. Yeah, because I was looking right dead toward her  when I heard a noise on them tires and turned around.

*1047 Q. Did you ever see her car attempt to make a left turn?
A. No.
Debbie and Michael Fuller, who were stopped at the intersection of Big Creek and Siwell Roads, both testified that Debbie had hesitated longer than usual at the stop sign because Roberts' truck "was coming too fast to pull out." Debbie Fuller saw the truck become airborne, but neither she nor her husband actually saw or noted the location of Henson's car prior to the accident.
Officer Jordan's accident report, however, states clearly that Henson's car turned left across Roberts' lane, hitting his vehicle head-on. On what did he base this conclusion? Jordan did not witness the accident, arriving on the scene sometime after it occurred. His report was based on a brief post-accident interview with Henson, who had sustained serious head and facial injuries, as well as multiple fractures to her knee. While Henson was still trapped in her vehicle, Jordan questioned her briefly about how the accident happened. On direct examination she testified as follows:
Q. And during this period of time, did anyone come up to you in any official capacity and ask you about how the wreck occurred?
A. No One did. Officer Jordan did come up to me and asked me if I was turning, and I told him I was.
Q. Where were you then?
A. I was in my car.
Q. You were in your car?
A. Yes, sir.
Q. You mean  was the jaws-of-life operating then?
A. No. It was before they got there.
Q. Did he quiz you extensively on how it happened?
A. He asked me that one question.
Q. And what did you say?
A. I told him yes.
Q. Told him yeah to what? I forgot the question. What was the question?
A. He asked me if I was turning.
Q. Yes. And what did you say?
A. I told him yes.
Q. Is that the full thing that you told him?
A. That's all I said to him.
Q. What did you mean?
A. I thought he was asking me if that's why I was sitting in the road was because I was gonna turn. I thought he meant was that my intentions.
On cross-examination, Jordan admitted that Henson had actually told him that she was stopped in anticipation of making a turn.
It appears from the record that Officer Jordan's perception that Henson had turned into Roberts' lane was also based on a gouge mark in the pavement; a gouge mark that was not noted in his accident report despite his initial testimony to the contrary, and further, one which he gave little thought to until some two years after the accident. Jordan recalls his interview with Henson as follows:
Q. Did she ever  did you ever ask her how fast she was going? You didn't because she was sitting still, right?
A. I asked her how fast she was going and then she said she was turning into the KEA. She has sat there and traffic was coming and she went to turn in. Right.
Q. Now, memories fade and sometimes things might become important at the time. We talked about how debris was not all that important, because you only had one level of that, didn't you, reconstruction?
A. Right.
Q. And you don't say that you're an expert, do you?
A. No, sir.
Q. Insofar as where the car was, do you have the independent recollection of that, or is that just because Cecelia said that's where the gouge mark was?
A. No. It was in my report from that day.
Q. Your report?

*1048 A. I just talked to Cecelia about it a couple of weeks ago.
Q. Where is your report?
A. (Witness searches for report).
Q. Where is it in your report?
A. What, the date?
Q. The gouge mark.
A. I don't have the gouge mark in here.
Q. I'm sorry. I thought you said it was in the report?
A. No.
Q. Is this the only report we're talking about?
A. That's it. That's my report.
Q. Is this your report?
A. That's my report.
Q. Where is the gouge mark in your report?
A. I don't have it.
Q. Well, I'm confused. You didn't put anything about a gouge mark in your report?
A. No, sir.
Q. So the first thing you heard anything about a gouge mark was about two years later?
A. Basically.
Q. As we say, we've heard questions propounded to other witnesses. Time goes on, memory fails, doesn't it, and you're making estimates and so forth?
A. Physical evidence doesn't fade.
Despite this testimony, Jordan contends that the gouge mark was under her car, and that those marks led straight to her tire. We are, therefore, presented with no concrete evidence to support Officer Jordan's accident report or the jury's decision that Christy Henson pulled out in front of Brad Roberts.
Much ado is made over Henson's subsequent alleged plea to Jordan to "reconsider" or "change" the accident report. In light of her testimony, however, as well as that of the other witnesses, her inquiry appears to have been a logical request for a correction of the facts. Instead, Officer Jordan's testimony served only to confuse, mislead and prejudice the jury. Thus, the circuit court improperly denied Henson's motion in limine to exclude Officer Jordan's testimony regarding his conversation with Henson about the accident report. In that motion, Henson sought to exclude the testimony because it improperly interjected the issue of insurance coverage into the trial and sought to impeach Henson on a point not even remotely related to the central issue of the trial: who caused the accident. M.R.E. 403 requires the exclusion of otherwise relevant evidence that might cause undue prejudice, confuse the issues or mislead the jury. Moreover, the testimony of Officer Jordan, a uniformed police officer, could serve only to cast aspersions upon Henson's credibility as a witness and as a plaintiff, contrary to M.R.E. 608(b), which provides that extrinsic evidence, except conviction of a crime, may not be used to prove specific instances of the conduct of a witness. See Ball v. Sloan, 569 So.2d 1177 (Miss. 1990) (testimony regarding altered prescriptions had bearing on plaintiff's credibility and should not have been admitted pursuant to M.R.E. 608(b). Hawkins and Lee, P.JJ., and Sullivan and Pittman, JJ., dissented, stating that this error was not "harmless," but prejudicial).
On cross-examination, Richard Spring, one of Henson's eyewitnesses, was questioned as to whether he had told a paralegal in Roberts' attorney's office that Henson's attorney had tried to get him to testify that he had seen Henson's left-hand turn signal blinking, when, in fact, he had not. Spring denied that Attorneys Fulgham or Gunter had done any more than ask him if the blinker was on at the time of the accident. U.C.C.R. 3.05, in effect at the time of the trial, required that attorneys be respectful not only to the judge, but also to opposing counsel and others in the courtroom. Likewise, U.C.C.R. 3.03 prohibited attorneys from abusing or personally criticizing opposing counsel in closing arguments. It goes without saying that this prohibition extended to the examination of witnesses. Roberts' inference that Henson's attorneys had attempted to influence Spring to testify to something he had not seen not only violates the letter and spirit of Rules 3.03 and 3.05, but further served to mislead the jury by challenging the integrity of the plaintiff's attorneys.
*1049 In McKinzie, we reversed the jury's verdict when we found it to be against the overwhelming weight of the evidence. Id. at 142. While we want to ever-cautious against abandoning our appellate role and playing thirteenth juror, where the evidence is contrary to the verdict rendered or the the verdict reflects that the jury was misled, prejudiced or confused, we must reverse and remand for a new trial. Accordingly, I dissent.