PAYNE, J.,
for the Court:
PROCEDURAL HISTORY
¶ 1. Patterson filed her complaint against Vend Foods, Inc., and its employee, Timmy Spradlin, in the Circuit Court of Lee County, Mississippi on June 30, 1995. A jury trial was held on July 21 and 22, 1997. After hearing the evidence, the jury voted in favor of Vend Foods, Inc. On August 4, 1997, the circuit court entered judgment for Vend Foods, Inc.
¶ 2. Feeling aggrieved by the jury verdict, Patterson moved for a judgment notwithstanding the verdict and for a new trial. The trial court overruled these motions. Feeling further aggrieved, Patterson perfected her appeal.
¶ 3. After thorough review, we find the verdict of the jury is contrary to the law in Mississippi regarding Miss.Code Ann. § 63-3-619 (Rev.1994), and the trial court erred in not granting Patterson’s JNOV and new trial. Accordingly, we must reverse and render on liability and remand for a new trial on damages only.
FACTS
¶ 4. On May 13, 1993, Wilhelean Patterson was driving her car in a northerly direction on Gloster Street in Tupelo, Mississippi when she was rear-ended by Timmy Spradlin. At the time of the automobile collision, Timmy Spradlin was an employee of Vend Foods, Inc. and driving a van owned by Vend Foods, Inc. The undisputed evidence at trial was that Gloster Street is populated with commercial businesses.
*1085 ¶ 5. Concerning the time of the automobile accident, Patterson testified that the car immediately preceding her turned into either a Wendy’s or a McDonald’s restaurant. She stopped. Thereafter, she witnessed a van coming toward her in the same direction that she was driving. In her own words she stated that “[t]he light was changing and I was like is he still coming. So, I grabbed my steering wheel, just I grabbed the steering wheel and braced myself.” Following the collision, she stated that she had pain “[i]n the back of my neck, it was a pain.” She stated that she was “hysterical” and “crying.”
¶ 6. Donald Tucker, a disinterested local witness to the collision, testified that he had pulled up to the carry out window of the Krystal Restaurant and was in the process of placing an order. With his view unimpeded, he witnessed the van driven by Spradlin collide with the car driven by Patterson. Tucker stated on direct examination:
I saw a white colored van pick up the speed, traveling approximately 35 to 45 miles per hour, and it hit the rear end of the vehicle, causing loud noise on impact. And at that time, like I say, I was standing at McDonald’s — -I mean at the Krystal’s, and I ran down at that time to respond to what had occurred there to see if anybody might be hurt.
¶ 7. After reaching the scene of the collision, Tucker stated that he spoke with Patterson. He indicated that Patterson was in “pain” and “[s]he was saying that her back and neck was hurting, and she was crying. And I tried to comfort her at that time.”
¶ 8. Timmy Spradlin’s review of what occurred that day varies significantly from the testimony offered by Patterson and her chief witness, Donald Tucker. Sprad-lin indicated that he was behind two vehicles, all of which were stopped at a red light on Gloster Street. Thereafter, he stated:
“Well, the light changed and we proceeded to go. We got nearly to the McDonald’s turn-in, the first one, the one closest to the red light, and the third car in front of us — the second car in front of me give a signal to turn to the right. Well, about that time, they decided they didn’t want to go in to McDonald’s, I don’t reckon. So, they proceeded to go straight on up. Well, at that time, the second car started to take off and, somehow or another, she [Patterson] stopped and let another car turn in front of her and I bumped her.”
¶ 9. Thereafter, he stated that he went to Patterson’s car and asked how she was doing. He stated that she told him “I’m fine.”
¶ 10. Following the collision, Patterson was transported to the North Mississippi Medical Center by ambulance where she was attended to by Dr. Barry Jones. She complained of neck and back pain. After physical therapy which lasted approximately three months and which failed to yield acceptable results, she was told that she should seek the services of Dr. John McFadden.
¶ 11. Dr. McFadden first saw Patterson on August 17, 1993 for complaints relating to the automobile accident. Patterson’s specific complaints concerned pain in her arm, right hip and groin area. Dr. McFadden diagnosed Patterson with both cervical and lumbar disc injury and determined that she has a physical impairment of fifteen percent to the body as a whole. He placed Patterson on anti-inflammatory medication, a muscle relaxer, Tylenol 3, and an antidepressant.
¶ 12. Patterson indicated that in August of 1993 she was suffering from pains which radiated into her legs and arms — “shooting pains” — “like if I was going upstairs or downstairs, like I could feel discomfort in my knees — and thighs.” She also stated that these leg pains created mobility problems. At times, she stated, “there was no feeling in the lower part of my leg.” Her testimony reveals that she fell several times in the course of her convalescence *1086 and when questioned about whether she had ever fallen prior to the automobile collision because of an inoperative leg, she stated, “[N]o, sir.” Likewise, she testified that prior to her automobile collision in May 1993, she never encountered that type pain in her legs.
¶ 13. Patterson returned to Dr. McFadden’s care on August 30, 1993, complaining of neck and shoulder pain. Further complaints involved a radiating pain in Patterson’s hip and right leg area and lower back pain. Dr. McFadden discontinued the use of Tylenol 3 as that medication induced nausea and placed Patterson on Darvocet-N 100. Following this treatment, McFadden visited with Patterson on September 28, 1998. Patterson’s chief complaint at that time was pain radiating in her right arm and continued neck pain. As of September 28,1993, Dr. McFadden had placed Patterson on a regimen of Ibuprofen, De-syrel, Darvocet-N 100, and Flexeril. On November 10, 1998, Dr. McFadden saw Patterson. He testified that Patterson complained of neck pain and appeared depressed. He also opined that Patterson told him that both of her legs had given out while she was walking. Dr. McFadden placed Patterson on Prozac. At that time, he gave Patterson a walking cane.
¶ 14. On November 19, 1993, Patterson visited with Dr. McFadden and chiefly complained about headaches, continued neck and arm pain and noted some numbness in her left hand. She was given an intramuscular steroid shot.
¶ 15. Following these visits, Patterson was seen by Dr. McFadden on March 1, 1994. At that time, Dr. McFadden noted that Patterson continued to suffer from neck pain and radiating pain in her left shoulder and left arm, lower back pain, and anterior chest pain.
¶ 16. On April 5, 1994, Patterson went walking in order to relieve stress.[1] She fell and fractured her leg. When asked to describe her walking pace, she characterized the pace as being “fast.” According to her testimony, she encountered immediate pain once she fell. Shortly thereafter, she was taken to the North Mississippi Medical Center where she was attended to by Dr. Ben Buchanan, with whom she consulted on the leg fracture. Surgery was required and a cast was placed on her leg. Dr. Buchanan opined that Patterson appeared to be an active physical lady. When her surgery was completed, Dr. Buchanan recalled that Patterson was in a “quite good” condition.
¶ 17. In reviewing the fracture that Patterson suffered, Dr. Buchanan opined that the injury Patterson received from falling (as Patterson indicated) was not consistent with a fracture when the legs give way. As Dr. Buchanan stated, “[Tjhat’s my opinion, based on 23 years of seeing broken legs.”
Q. Doctor, do you have an opinion, based upon a reasonable degree of medical certainty, as to whether Ms. Patterson’s leg injury would be related to any disc injury or disease?
A. I know of no direct correlation.
¶ 18. Dr. McFadden last saw Patterson — concerning the automobile collision in question — on November 7, 1996. At that time Patterson reported continued neck pain and lower back pain. She was on several medications: Desyrel, Darvocet-N 100, Shelaxin, and thyroid medication.
¶ 19. Concerning the connection between the automobile collision and the fall Patterson received when her legs went out from under her, and based on the history “that Ms. Patterson provided you and the complaints that she provided to you, is it at all a surprise to you that she fell and fractured her leg?” Dr. McFadden replied, “[N]o.” As indicated by the testimony of Dr. McFadden, Patterson’s treating physi *1087 cian believed there to be a connection between the injuries sustained from the automobile collision and those received from the injury on April 5,1994.
ISSUES PRESENTED
PART I
I. WHETHER SPRADLIN WAS NEGLIGENT AS A MATTER OF LAW AS THERE WERE NO UNUSUAL OR EMERGENCY CIRCUMSTANCES LEADING TO THE COLLISION.
II. WHETHER THE JURY’S DEFENSE VERDICT IS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 20. We begin our analysis with a brief overview of the standard of review employed when reviewing cases which have been submitted to the jury and which have been appealed. In general, courts normally do not interfere with jury determinations. Wells Fargo Armored Service Corp. v. Turner, 543 So.2d 154, 156 (Miss. 1989) (quoting Travelers Indem. Co. v. Rawson, 222 So.2d 131, 134 (Miss.1969)). There are, however, exceptions to the general rule. McKinzie v. Coon, 656 So.2d 134, 142 (Miss.1995) (stating a jury verdict should not be set aside “unless the jury is improperly instructed on the law, mislead, confused or ignores the weight of the evidence.”).
¶ 21. Supplementing the above noted language, the supreme court has stated that the test applied to jury verdicts in civil cases is:
Once the jury has returned a verdict in a civil case, we are not at liberty to direct that judgment be entered contrary to that verdict short of a conclusion on our part that given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found.
Henson v. Roberts, 679 So.2d 1041, 1045 (Miss.1996).
¶ 22. With that groundwork laid, we now turn to the specific arguments presented by each side and their relation to this issue presented below.
¶23. Patterson contends that the evidence in the instant case clearly established the negligence of Timmy Spradlin as a matter of law. The applicable traffic laws germane to the issue raised today are found in Thomas v. McDonald, 667 So.2d 594 (Miss.1995) and Miss.Code Ann. § 63-3-619 (Rev.1994). Thomas, 667 So.2d at 596 (Miss.1995) states that:
Generally, when two cars are traveling in the same direction, the primary duty of avoiding collision rests with the second driver, who, in the absence of an emergency or unusual condition, is negligent as a matter of law if he runs into the car ahead.
¶ 24. Along those lines, Miss.Code Ann. § 63-3-619 (Rev.1994) states:
(1) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.
¶ 25. Turning toward the facts, we find that Vend Foods, Inc. has admitted that Timmy Spradlin rear-ended the car driven by Willielean Patterson. Vend Foods, Inc. also acknowledges the language found in Thomas. However, Vend Foods Inc. insists that the Thomas rule does not create an absolute duty to avoid a collision. Vend Foods, Inc. states that this Court should review the evidence and look for circumstances surrounding the collision and determine whether an emergency or “unusual” condition occurred. If an emergency or “unusual condition” arises, the driver of the following car may not be negligent even if he or she does not prevent their vehicle from colliding with the preceding vehicle. Thomas, 667 So.2d at 596. The problem implicit with the argu *1088 ment presented by Vend Foods Inc., concerns the lack of evidence in which this Court, much less a jury, could have found as it did. Nothing in the record evidences an “unusual” or “emergency” circumstance which would insulate Spradlin’s actions on the day of the collision.
¶26. After reviewing the evidence, we find undisputed evidence in the record that Patterson was rear-ended by Spradlin on a street packed with businesses and filled with traffic where people turning and leaving the thoroughfare is a virtual certainty. From our review of the testimony, we find that it was overwhelmingly proven that Spradlin followed so closely behind Patterson that he committed a negligent act when the vehicle he was driving hit Patterson’s automobile. Thus, as a matter of law, we do not find that a reasonable, hypothetical juror could have delivered the verdict as given, considering the fact that a collision is acknowledged by both parties, and a disinterested eye-witness — with an unimpeded view of the scene — observed the collision, pointing blame to Spradlin. Those circumstances, coupled with medical proof of physical injury and a lengthy period of convalescence require this Court to reverse and render on the issue of liability and damages associated with the automobile accident.
¶ 27. Having reviewed the situation, we find that under the law of McKinzie v. Coon, 656 So.2d 134, 142 (Miss.1995), a jury verdict can and will be set aside when the jury ignores the obvious, and in this case it is apparent that the jury totally disregarded what was placed before them for review.
PART II
III. WHETHER THE PHYSICAL EFFECTS CAUSING PLAINTIFF’S LEG FRACTURE WERE CONTINUOUS FROM THE TIME OF THE ACCIDENT TO THE FALL.
IV. WHETHER COURT’S INSTRUCTION REGARDING NON-CONSIDERATION OF THE LEG FRACTURE UNFAIRLY PREJUDICED PLAINTIFF.
¶ 28. The above ruling on the first two issues renders moot the question of whether the injury due to the fall on April 5, 1994 was connected to the automobile collision which occurred on May 5, 1993. We have reversed and rendered on the issue of negligence in the cause of the initial injury. Because we are remanding for new trial for the determination of damages, evidence as to the relationship of the broken leg and its attendant issue of damages will have to be addressed on remand.
¶ 29. The uncontradicted evidence in the instant matter reveals that Patterson was initially treated in the emergency room for her injuries sustained in the automobile collision and was thereafter placed on a regiment of physical therapy that failed to yield acceptable results. Thereafter, she was examined and treated by Dr. McFadden who administered several treatments — including treatments for depression and pain which radiated throughout her body on a continued basis — none of which completely healed Patterson. Suffice it to say, Patterson suffered through a period on extensive debilitation, and finally when she was able to return to a normal routine of exercise, she was once again injured.
¶ 30. Dr. McFadden testified with respect to the leg fracture, stating that he was not surprised that Patterson fell. Furthermore, Dr. McFadden’s testimony, when taken as a whole, provides sufficient medical support for the jury’s consideration of a causal nexus between the automobile collision and the fall and leg fracture. The evidence proved the fall and fractured leg are traceable to one incident, that being the automobile accident on May 13, 1993, and it was error to prevent the jury from considering this injury.
¶ 31. Having reviewed the situation, we remand the issue of damages to the trial court for a hearing on the matter.
*1089 CONCLUSION
¶ 32. On the issue of liability, we reverse and render. It is obvious that Spradlin committed a negligent act. We remand on the issue of damages for the injury resulting from the collision. Furthermore, we remand for rehearing on the issue of the causal connection between that injury and whether Patterson’s complications subsequent to the accident were connected to the collision, and if so, for a hearing on damages.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY IS REVERSED AND RENDERED IN PART AND REVERSED AND REMANDED IN PART. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLEES.
KING, P.J., BRIDGES, COLEMAN, IRVING, AND LEE, JJ., CONCUR.
DIAZ, J., CONCURS IN PART.
McMILLIN, C.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SOUTHWICK, P.J., AND THOMAS, J., and DIAZ, J., CONCURS IN PART.

. Patterson claimed that in the past she would often walk or run eight to ten miles a day in order to relieve stress.