IRVING,
for the Court:
¶ 1. Carlos Craft was convicted in the Circuit Court of Walthall County of armed robbery. He appeals, assigning as error the following issues which are quoted verbatim from his brief:
I. The trial court erred in allowing State’s Exhibit 16 to be admitted into evidence without proper identification or without laying a proper foundation.
II. The trial court erred in allowing Trentice Lee to be considered a hostile witness.
III. The trial court erred as a matter of law by denying Carlos Craft’s motion to suppress admission of the money that was seized pursuant to an illegal search and seizure.
IV. The verdict of the jury was against the overwhelming weight of the evidence.
*1255 V. The trial court erred in not declaring a mistrial after a prayer that was heard by the jury.
Finding no reversible error, we affirm.
FACTS
¶ 2. On the early morning of September 23, 1997, two masked robbers, armed with pistols, entered David Cooley’s mobile home and demanded money. The robbers took approximately $6,000 or $7,000 in cash and a cellular phone. Cooley and Janice Holmes were present in the mobile home when the robbers entered the home. During the robbery, Cooley recognized the voice of one of the robbers as belonging to Craft. Even though the lighting in the trailer was very poor, Cooley was also able to identify Craft as one of the robbers. When the police arrived at the scene, Cooley told the police that one of the culprits was Craft. Cooley described Craft as being of slim build, having a gold tooth, dressed in black with a stocking over his face. Holmes could not positively identify the culprits. This information eventually led the police to secure an arrest warrant for Craft. Craft was indicted and tried jointly with Derrick Newell; however, at the end of the trial, Newell was acquitted of armed robbery.
¶ 3. Other facts will be discussed as necessary during the discussion of the issues.
ANALYSIS OF THE ISSUES PRESENTED

I. Did the trial court err in allowing State’s exhibit 16 tobe admitted into evidence without proper identification or without laying a proper foundation?

¶ 4. Craft argues that the circuit court erred in allowing into evidence a handwritten note alleged to be authored by Craft while incarcerated. Craft gave the note to a trustee who, in turn, gave the note to Officer Rushing. The note was introduced during the direct examination of Officer Rushing. During that direct examination, the following colloquy occurred:
Q. I’m going to hand you a document and ask if you can identify this document?
A. Yes.
Q. What is this?
A. This was a note that was retrieved in the jail of the Walthall County Sheriffs Department.
Q. And from whom was it retrieved?
A. Carlos Craft—
BY MR. PRICE: — Your Honor, I object unless he can show a basis for personal knowledge of this officer to testify to this—
BY MR. GOODWIN: — Your Honor, I’ll point out that Mr. Craft has identified this himself
BY MR. PRICE: — Your Honor—
BY THE COURT: — Ladies and gentlemen, go with your bailiffs to the jury room, please.
(JURY EXCUSED FROM COURTROOM.)
BY THE COURT: Wait a minute. We need to get this on the record. You need to refresh my memory as to what happened.
BY MR. GOODWIN: Your Honor, at the suppression hearing Mr. Craft took the stand and at the time that he took the stand he — there was some testimony back and forth concerning things found in the trailer, ownership of some guns. Mr. Craft took the stand at the suppression hearing and said that the guns were not his, that he had never had anything to do with the guns. I questioned him about this document to impeach him and said, ‘well, if you never had anything to do with the guns, why did you write this note and he acknowledged at that time that this note was his and that 'he wrote it.
*1256 BY MR. PRICE: And we would submit that that is in fact what happened.
BY MR. GOODWIN: Okay.
BY MR. PRICE: I didn’t remember that.
BY MR. GOODWIN: And, therefore, we maintain that this is a statement against interest.
BY THE COURT: How did the officer come into possession of this?
BY MR. GOODWIN: It was retrieved in the jail when — well, I’d better let him — I know how I think he got it.
Q. How did you come into possession of this, Officer
A. One of the trusties retrieved it. Okay.
BY THE COURT: All right. I don’t know any — if he offers it into evidence I don’t know any way to — do you have any specific objection to it coming it, [sic] Mr. Price?
BY MR. PRICE: No sir.
BY THE COURT: All right. Then it will be received.
¶ 5. The State argues that at trial Craft’s counsel specifically stated that he had no objection to the note being introduced into evidence; therefore, -the State asserts that this issue is procedurally barred as having been waived by Craft’s failure to make an objection. We agree. Craft initially objected to Officer Rushing’s testifying to the contents of the note based on Rushing’s not having personal knowledge about the note; however, as reflected in the quoted colloquy Craft’s counsel clearly and emphatically stated at the end of the discourse between the court and prosecutor that he had no objection to the admission of the note. Craft is procedurally barred from asserting this issue on appeal. See Stewart v. Stewart, 645 So.2d 1319, 1322 (Miss.1994).

II. Did the trial court err in allowing Trentice Lee to he considered a hostile witness?

¶ 6. The decision to allow leading questions is one that rests within the discretion of the trial court and will only be reversed upon a showing of abuse of discretion. McFarland v. State, 707 So.2d 166, 175 (Miss.1997). Rule 611(c) of Mississippi Rules of Evidence states that “when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.”
¶ 7. The State called Trentice Lee to testify. The prosecutor requested permission to ask Lee leading questions after Lee gave in-court testimony that differed from her pretrial statement in two respects— whether she knew where Craft, Magee and Newell went when they left her house on September 22nd around 3:00 p.m. and whether she saw them again on that day. Lee’s counsel objected on the basis that there had not been a showing that the witness was hostile. The trial court took the prosecutor’s request under advisement and told the prosecutor that if the witness did not respond adequately to questions, the court would allow the witness to be handled under Rule 611(c).
¶ 8. The prosecutor resumed his direct examination. During further direct examination-after Lee testified that only Craft and Timos came back to her house around 2:00 a.m. — the prosecutor first attempted to examine Lee about a statement she had given to the police[1] but changed his mind and asked Lee about Newell’s whereabouts. When Lee said she did not know, the prosecutor turned to the court for help, but the court interrupted him, saying, “All right. I sustain the request Mr. Goodwin.” The prosecutor then began to ask leading questions of Lee about the statement but was interrupted by Craft’s counsel with the following objection, “I object. If he wants to make his own witness a hostile witness, that’s fine, but we *1257 submit that under 4.03 — could the jury be excused.”
¶ 9. After the jury was excused, Craft’s counsel made a 4.03 objection that the statement was more prejudicial than probative and offered to allow admission of Lee’s unsworn pretrial statement to police. Newell’s counsel suggested that Lee might be confused instead of hostile. The court then suggested that an effort be made to clear things up. The witness was questioned further, but the prosecutor remained dissatisfied with Lee’s responses. At that point in the trial, the record reflects the following exchange occurred:
BY MR. GOODWIN: Your Honor, I think it is patently clear that — and quite frankly, something has happened with this witness between 5:00 o’clock yesterday afternoon and this morning. This witness is not wanting to testify against Derrick Newell. I don’t think the rule actually says she has to be hostile to ask her leading questions, only that she be identified with another party. She has just sat here and admitted in essence a moment ago she was holding back information. I think I should be offered the widest latitude in cross-examining her in front of this jury.
BY THE COURT: I’ll allow you to ask leading questions, Mr. Goodwin. I’m not sure how much wider latitude you can get than that.
BY MR. GOODWIN: That’s about as wide as I want.
BY THE COURT: All right. Under Rule 6.11[sic] Mr. Price?
BY MR. PRICE: Yes, sir, Your Honor, while the jury is out, the reason I have a problem with Mr. Goodwin leading this witness is that I’m not sure of her mental competency, and I think we need to inquire as to her status, how she is mentally, (emphasis added).
¶ 10. Craft argues that the trial judge erred in allowing the prosecutor to ask leading questions of Lee because she was not identified with an adverse party and no foundation was laid for having her declared a hostile witness. Craft argues that the test articulated in Harris v. Buxton T.V., Inc., 460 So.2d 828, 833 (Miss.1984) establishes a limitation as to how closely a witness must be identified with the adverse party before being treated as an adverse witness.
¶ 11. In Harris, the Mississippi Supreme Court stated the following:
(1) If the witness’ acts or omissions are the predicate for a party’s claim or defense, ... then that witness is ordinarily sufficiently identified with an adverse party and may be called as an adverse witness and interrogated by leading questions.
(2) If the conduct of the witness plays such an integral part in the transaction or occurrence which is the subject of the action and which gives rise to the defendant’s potential liability, .... then again the witness is said to be sufficiently identified with the adverse party so that the witness may be called as an adverse witness and cross-examined.
However, the comment section of M.R.E. 611 provides, and the State argues, that the advisory committee is cognizant of the Harris decision but considers the interpretation and application of the phrase “identified with the adverse party” to be broader than expressed in Harris. See McFarland, 707 So.2d at 175.
¶ 12. Harris provides no support for Craft’s argument, for it deals with an adverse witness situation in a civil context, not a hostile witness in a criminal context as does our case. We also find Craft’s appellate argument to be a bit disingenuous. He argues here that the trial court erred in allowing leading questions because Lee was not a hostile witness. He also blurs the distinction between an adverse witness and a hostile witness. How *1258 ever, at trial, as shown by his counsel’s statements quoted previously, his objection was based not on the absence of Lee’s hostility or lack of identification with an adverse party, but on her mental competency and the prejudicial effect of allowing the prosecutor to cross-examine her about her pretrial statement.
¶ IB. After the competency issue was raised, the court interrogated Lee about her condition. Lee advised that she had consumed a six-pack of beer on the morning of the trial. At that point, her testimony was halted to have a Breathalyzer administered to determine her level of intoxication. The record does not reflect whether the Breathalyzer was in fact administered.
¶ 14. When Lee was ultimately returned to the witness stand, following the lack of competency assertion, leading questions were allowed. The record fully supports the trial judge’s conclusion that Lee was a hostile witness. Consequently, there was no abuse of discretion on the part of the trial judge. This issue is without merit.

III. Did the trial court err as matter of law by denying Carlos Craft’s motion to suppress the admission of the money that was seized pursuant to an illegal search and seizure?

¶ 15. Officers Rushing and McMur-ray, along with several other officers, arrived at Craft’s residence to execute an arrest warrant for Carlos Craft. They did not have a search warrant. During the suppression hearing, Officer Rushing and Officer McMurray testified that they approached the premises, knocked on the door and identified themselves. Both officers testified that Ms. Lenoir, Craft’s mother, opened the door. Officer McMur-ray asked whether Ms. Lenoir was the owner of the house, and Ms. Lenoir responded affirmatively. The officers told Ms. Lenoir that they had an arrest warrant for Craft. Both officers stated that Ms Lenoir told them that Craft was in the back room. Officer Rushing asked permission to enter and search. Both officers testified that Ms. Lenior gave permission to search the premises. Officer McMur-ray testified that Ms. Lenior led them to Craft’s room.
¶ 16. Once the officers entered the room, they found Craft lying on the bed. Officer Rushing advised Craft of the arrest warrant and placed him under arrest. Officer McMurray asked Craft whether the room in which he was found was his room, and Craft stated that it was his room. Officer McMurray asked Craft “did he have any problem if he searched the room.” McMurray testified that Craft said “he did not ... no, go ahead.” McMurray further testified that he explained to Craft that “he did not have to let us [search] if he did not want to.” McMurray testified that Craft responded, “no, go ahead.”
¶ 17. Afterwards, Officer Rushing handcuffed and carried Craft to the patrol car. Before Officer Rushing and Craft left the room, Officer McMurray found, in plain view, a purple satchel containing two weapons. The officers also found ammunition, other weapons, stockings, marijuana, and razor blades. Officer McMurray also found approximately $1217 under the bed. Officer McMurray drew a diagram of the location of all items found during the search, some of which were in plain view.
¶ 18. Craft and Ms Lenoir testified to a different set of events. Ms. Lenoir testified that, after the officers identified themselves, she went to the back room to wake Craft. Ms. Lenoir stated that Craft was awake and that “he was just laying there shaking his feet out from under the cover.” Ms. Lenior told Craft that the police had a warrant, but Craft did not get up. Ms. Lenior returned to the front door; however, she told the police to “hold up and let me go try to get him up again.” Ms. Lenior stated that as she walked down the hallway, the officers followed her. Ms. Lenior testified that she never gave the officers permission to search the premises.
*1259 ¶ 19. Craft testified that, once the police entered his room, the officers informed him of the warrant. Craft testified that Officer McMurray asked whether he had any guns in the room. Craft responded, “ain’t no guns supposed to be in here because I’m on probation.” Craft stated that Officer McMurray began walking around the room and picked up a purple satchel and said “oh look what I found,” and then Officer Rushing took Craft to the patrol car.
¶20. Craft argues that the trial court erred in denying his motion to suppress the money and other articles seized from his bedroom because he never executed a knowledgeable waiver of his right to refuse the search of his bedroom. Craft argues that the trial court failed to make a finding as to whether the prosecution met its burden of proof in regards to the consent to search. Craft specifically argues that no ruling was made on the money seized. Craft argues that the ruling was in the context of a search incident to an arrest and not in the context of whether the prosecution met its burden regarding a consensual search.
¶21. Where there is substantial and credible evidence supporting a finding of fact made by the trial court during a suppression hearing, that finding will not be disturbed by the reviewing court. Ellis v. State, 667 So.2d 599, 605 (Miss.1995). We find there was substantial credible evidence supporting the trial court’s findings.
¶ 22. From the testimony and the totality of the circumstances, the trial judge found:
[Ajrmed with two warrants these officers had not only the right, but the obligation to go into whatever place and arrest the defendant. The fact they allowed the Mother to go to try to get him to come to the door voluntarily is of course above and beyond the call of what their duty was. They could have gone and served the warrant without permission, but, be that as it may, I think it clears the air about whether or not they were in the home lawfully. They were in the home lawfully whether they were there with her permission or doing their job of executing the Warrants [sic].
¶ 23. The trial judge also found that there was credible evidence that the officers were given consent to search, despite any conflicting evidence to the contrary.
¶24. There are numerous exceptions to the requirement of obtaining a valid search warrant. Graves v. State, 708 So.2d 858, 862-63 (Miss.1997). Consent to search is an exception to the general rule requiring a search warrant. Id.
¶ 25. Despite the conflicting evidence, the trial judge made a finding that Craft’s consent was voluntary and informed, and we will not disturb this finding. Craft argues that the State did not meet its burden of proving that the waiver was knowledgeable. Assuming Craft met his burden at trial of claiming his waiver was not knowledgeable, we find that the State met its burden of producing credible evidence that the waiver was knowledgeable. See Graves, 708 So.2d at 864 (stating that the burden is on the defendant to raise the issue of lack of knowledgeable waiver). As noted above, the State produced the testimony of two officers who testified that they asked for permission to search and that Craft granted it. One of these officers, Officer McMurray, testified that he told Craft that Craft did not have to let them search if he did want to let them search. According to the officer, Craft’s response was, “no go ahead.” There was no indication that Craft acted out of a mistaken belief that he had to grant permission to the officers. This argument lacks merit.
¶ 26. Craft also argues that the trial judge did not make a specific finding as to whether the State met its burden as to the money found under Craft’s bed. We are not sure as to what Craft’s argument is on this point. His argument may be that the *1260 money was not in plain view; therefore, it could not be seized pursuant to a legal arrest. Though the trial court stated that the money was seized incidental to an arrest, the trial court also found that Craft gave his consent to search. That being the case, Craft’s consent obviated the necessity to obtain a search warrant, and the officers were entitled to conduct a search commensurate with the permission given. There is nothing in the record that would indicate Craft gave limited permission to search. Therefore, all items seized, including the money, could be properly admitted into evidence if relevant. Craft makes no relevant argument with respect to the seized items, and since he does not raise that issue in this appeal, we decline to address it. Since the items seized were the result of a valid waiver to search without a search warrant, a discussion of the search incident to Craft’s arrest is rendered unnecessary.
TV. Was the verdict of the jury against the overwhelming weight of the evidence?
¶ 27. When we consider whether the jury’s verdict is against the overwhelming weight of the evidence, we accept as true all evidence supporting the verdict. Ellis v. State, 667 So.2d 599, 611 (Miss.1995). Reversal is warranted only when this court is convinced there was an abuse of discretion in the trial court’s denial of a new trial. Id.
¶ 28. Craft contends that the evidence as presented in the testimony of David Cooley and Janice Holmes was of “dubious value and credibility.” In particular, Craft argues that there were many inconsistencies with the identification testimony given by Cooley and Holmes. Craft argues that the testimony given by Cooley and Holmes regarding the gun used during the robbery was also inconsistent.
¶ 29. Where the verdict turns on the credibility of conflicting testimony and the credibility of the witnesses, the Mississippi Supreme Court has held that it is the jury’s duty to resolve the conflict. Nicholson v. State, 523 So.2d 68, 70 (Miss.1988). The jury has the right and duty to determine the truth or falsity of the witnesses’ testimony. Henson v. Roberts, 679 So.2d 1041, 1045 (Miss.1996). The jury also has the right to evaluate and determine what portions of the testimony it will accept or reject; therefore, unless it is clear to us that the verdict is contrary to the overwhelming weight of the credible testimony, we will not set aside the verdict of a jury. Id.
¶ 30. In the case sub judice, the record contains ample evidence to support the jury’s verdict. The record reflects that Cooley identified Craft as one of the culprits. When the police arrived at Craft’s home, stockings similar to the ones used as masks during robbery were found, as well as guns and money. When reviewing the evidence in the light consistent with the verdict and giving the State all favorable inferences which may be drawn from the evidence, we find that the verdict was not against the overwhelming weight of the credible evidence. Griffin v. State, 607 So.2d 1197, 1201 (Miss.1992). Accordingly, we find this issue lacks merit, and we will not disturb the verdict of the jury.

V. Did the trial court err in not declaring a mistrial after a prayer was heard by the jury?

¶ 31. At the close of all the evidence and prior to the closing arguments, the trial court allowed a prayer to be given in observance of National Day of Prayer. The court reporter did not record the content of the prayer. Following closing arguments, Craft moved for a mistrial on the basis that he was prejudiced by the prayer. Craft argued at trial and now claims on appeal that the prayer “contained the message about problems arising in our country like people stealing and killing.” After listening to the arguments on the motion, the trial court stated “I did not find the prayer to be offensive or prejudicial, but in order to be — to exercise as much caution as I can, I will instruct the *1261 jury that they are not to infer anything from the prayer regarding this case.” Craft requested that the trial judge “leave it alone.”
¶ 32. “A trial judge is in a better position to assess the effect of incidents which may require a mistrial than is this Court on appeal, and this Court will not reverse on the failure to grant a mistrial unless the trial judge abused his discretion in overruling the motion for a mistrial.” Bredemeier v. Jackson, 689 So.2d 770, 774 (Miss.1997). It is evident that the trial judge carefully considered the prejudicial effect, if any, of the prayer on the jury. He offered to admonish the jury orally, but Craft declined the offer. Under the circumstances, the trial judge did not abuse his discretion by denying the motion for a mistrial. Therefore, this issue is without merit.
¶ 33. THE JUDGMENT OF WALT-HALL COUNTY OF CONVICTION OF ARMED ROBBERY AND SENTENCE OF THIRTY-SIX YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS; FINE OF $10,000 AND FULL RESTITUTION OF $6,500 MINUS THE AMOUNT ENTERED AS EVIDENCE IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO WALT-HALL COUNTY.
McMILLIN, .C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, LEE, MOORE, MYERS, PAYNE, AND THOMAS, JJ., CONCUR.

. In her pretrial statement, Lee had apparently said that all three men came back to her house around 2:00 a.m. on September 23rd, the night of the robbery.